NORTHERN SECURITIES CO. v. HARRIMAN et al.

(Circuit Court of Appeals, Third Circuit. January 3, 1905.)

No. 52.

1. APPEAL—ORDER GRANTING PRELIMINARY INJUNCTION—REVIEW.

Where the opinion of a Circuit Court in granting a preliminary injunction shows that the judge regarded as of controlling importance the fact that an order denying the injunction would not be reviewable by appeal, the rule that the appellate court will not interfere with the exercise of the discretionary power of the court of first instance unless there is strong reason for it does not apply, and the question of the right to the injunction will be determined on the merits.

2. CORPORATIONS—PURCHASE OF STOCKS—CONSTRUCTION OF CONTRACT.

A contract by which defendant, the Northern Securities Company, acquired from complainants certain shares of stock of the Northern Pacific Railway Company, held, under the evidence, to have been one of purchase and sale, by which defendant, on payment of the agreed price, became the absolute owner of the shares, free from any trust in favor of the complainants, and free to distribute the same pro rata among all its stockholders upon the entry of a decree declaring it to be an illegal combination, and prohibiting it from voting or receiving dividends on such stock.

3. SAME—MANNER OF DISTRIBUTING ASSETS.

Defendant corporation having been adjudged an illegal combination in restraint of interstate commerce, and enjoined from voting or receiving dividends on certain railroad stock which it owned, but permitted to transfer the same to its stockholders, a plan adopted by its directors and stockholders to distribute the same pro rata among all its stockholders was equitable, and its execution should not be enjoined.

4. APPEAL—ORDER GRANTING PRELIMINARY INJUNCTION—REVIEW.

It is a proper exercise of discretion for a court to grant a preliminary injunction where the bill and evidence present a prima facie case and raise important and doubtful questions of law and fact, and, unless the injunction is granted to preserve the status quo until the hearing, the suit would be ineffective; and an order for an injunction, granted on such grounds after the court has given due consideration to the balance of inconvenience and injury which may result to one party or the other, should not be reversed by an appellate court before the case has been finally heard and determined by the court below on full proofs. Per Gray, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the District of New Jersey.

Elihu Root and John G. Johnson, for appellant.

D. T. Watson and Wm. D. Guthrie, for appellees.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

DALLAS, Circuit Judge. This is an appeal by the Northern Securities Company from a decree of the Circuit Court for the District of New Jersey awarding a preliminary injunction, by which that company was restrained from disposing of 717,320 shares of the common stock of the Northern Pacific Railway Company. It appears from the opinion of the learned judge of the court below that in granting this injunction he was materially influenced by the consideration that the questions involved were, as he viewed them, serious and doubtful, and that a decision by him denying the injunction would, if made, not be reviewable upon appeal. We think that upon this ground he was justi-

fied in requiring that the status quo should be preserved, and the subject-matter of the controversy be withheld from dissipation until the judgment of this court could be obtained. But now the substantial rights of the parties only need be considered, and whether the injunction should stand or be dissolved ought, in our judgment, to be determined upon the merits, and without further delay. Western Union Telegraph Company v. Pennsylvania Railroad Company, 123 Fed. 33–36, 59 C. C. A. 113. There have been cases, it is true, in which it has been held that, where the court of first instance has unreservedly exercised its discretion in granting or refusing a preliminary injunction, its action ought not to be interfered with by an appellate court, "unless there is some strong reason for it." Massie v. Buck, 128 Fed. 31, 62 C. C. A. 535. But to the circumstances of this case those rulings are inapposite. Attentive reading of the opinion of the learned judge of the Circuit Court has satisfied us that he regarded the fact that an appeal would not lie from a denial of the injunction as "of controlling importance," and that his decision was made with the understanding that the defendant below would be entitled to invoke a complete adjudication of the entire controversy by this court; and we think that reason and justice demand that such an adjudication shall not be further postponed. The injunction complained of precludes the enjoyment of rights of ownership in property of great value. The facts upon which the propriety of upholding it depends are unquestionably disclosed in the record before us, and the principles by which the legality of the order awarding it must be tested are indubitable, and may be as readily applied now as at any time hereafter. The only substantial question is as to whether the decree below was accordant with law, and that question this court could not refuse to determine without, in effect, renouncing the appellate jurisdiction which Congress has expressly conferred upon it.

In November, 1901, the Northern Securities Company was incorporated under the laws of the state of New Jersey. Its total authorized capital stock was $400,000,000, divided into 4,000,000 shares of the par value of $100 each. The amount of the capital stock with which the corporation could commence business was fixed at $30,000. Its duration was to be perpetual, and its objects were certified to be, inter alia, as follows:

"(1) To acquire by purchase, subscription or otherwise, and to hold as investment, any bonds or other securities or evidences of indebtedness, or any shares of capital stock created or issued by any other corporation or corporations, association or associations, of the state of New Jersey or of any other state, territory or country.

"(2) To purchase, hold, sell, assign, transfer, mortgage, pledge, or otherwise dispose of, any bonds or other securities or evidences of indebtedness created or issued by any other corporation or corporations, association or associations, of the state of New Jersey, or of any other state, territory or country, and, while owner thereof, to exercise all the rights, powers and privileges of ownership.

"(3) To purchase, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of shares of the capital stock of any other corporation or corporations, association or associations, of the state of New Jersey, or of any other state, territory or country; and, while owner of such stock, to exercise all the rights, powers and privileges of ownership, including the right to vote thereon."

The Securities Company was promptly organized in pursuance of its certificate of incorporation, from which the foregoing clauses have been extracted, and very shortly thereafter the associate stockholders of the Great Northern Railway Company transferred to the Securities Company a controlling interest in the capital stock of the Great Northern Railway Company upon an agreed basis of exchange of $180 par value of the capital stock of the Northern Securities Company for each share of the capital stock of the Great Northern Railway Company, and the associate stockholders of the Northern Pacific Railway Company assigned and transferred to the Northern Securities Company a majority of the capital stock of the Northern Pacific Railway Company upon an agreed basis of exchange of $115 par value of the capital stock of the Northern Securities Company for each share of the capital stock of the Northern Pacific Railway Company. For the stock of these railway companies, whether transferred as above stated, or subsequently acquired upon the same basis, and also for about $7,522,000 paid to it in cash, the Securities Company issued its stock certificates in the following form:

Authorized Capital Stock, $400,000,000.

No. ———.                                                                    ——— Shares.

Northern Securities Company.

Incorporated and Registered Under the Laws of the State of New Jersey.

This Certifies that ——— is the registered holder of ——— Shares of the Capital stock of the Northern Securities Company of One hundred dollars each, transferable only on the books of the company by the holder hereof, in person or by duly authorized attorney, upon surrender of this certificate.

This certificate shall not become valid until countersigned by the transfer agent and also by the registrar of transfers.

In testimony whereof, the said company has caused this certificate to be signed by its President and Treasurer this ——— day of ———, A. D. 190–.

———————,                                                        ———————,
Treasurer.                                                                 President.
Countersigned this ——— day of ———, A. D. 190–.

———————,
Transfer Agent.
Countersigned and Registered this ——— day of ———, A. D. 190–.
Manhattan Trust Company,
Registrar of Transfers.
By ———————,
Shares, $100 each.                                                          Secretary.

In March, 1902, a bill was exhibited by the United States, in the Circuit Court for the District of Minnesota, against the Northern Securities Company, the Northern Pacific Railway Company, the Great Northern Railway Company, James J. Hill, William P. Clough, D. Willis James, John S. Kennedy, J. Pierpont Morgan, Robert Bacon, George F. Baker, and Daniel Lamont. The object of this bill was to restrain the violation of the act of Congress of July 2, 1890, c. 647, § 1, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200], entitled "An act to protect trade and commerce against unlawful restraints and monopolies," and the suit which it originated was so proceeded with that in April, 1903, the said Circuit Court adjudged and decreed:

"That the defendants above named have heretofore entered into a combination or conspiracy in restraint of trade and commerce among the several states, such as an act of Congress approved July 2, 1890, entitled 'An act to

protect trade and commerce against unlawful restraints and monopolies,' denounces as illegal; that all the stock of the Northern Pacific Railway Company and all the stock of the Great Northern Railway Company now claimed to be held and owned by the defendant the Northern Securities Company was acquired and is now held by it in virtue of such combination or conspiracy in restraint of trade and commerce among the several states; that the Northern Securities Company, its officers, agents, servants, and employés, be, and they are hereby, enjoined from acquiring or attempting to acquire further stock of either of the aforesaid railway companies; that the Northern Securities Company be enjoined from voting the aforesaid stock which it now holds or may acquire, and from voting at any meeting of the stockholders of either of the aforesaid railway companies, and from exercising or attempting to exercise any control, direction, supervision, or influence whatsoever over the acts and doings of said railway companies, or either of them, by virtue of its holding such stock therein; that the Northern Pacific Railway Company and the Great Northern Railway Company, their officers, directors, servants, and agents, be, and they are hereby, respectively and collectively enjoined from permitting the stock aforesaid to be voted by the Northern Securities Company, or in its behalf by its attorneys or agents, at any corporate election for directors or officers of either of the aforesaid railway companies, and that they, together with their officers, directors, servants, and agents, be likewise enjoined and respectively restrained from paying any dividends to the Northern Securities Company on account of stock in either of the aforesaid railway companies which it now claims to own and hold; and that the aforesaid railway companies, their officers, directors, servants, and agents, be enjoined from permitting or suffering the Northern Securities Company, or any of its officers or agents, as such officers or agents, to exercise any control whatsoever over the corporate acts of either of the aforesaid railway companies. * * * "

Upon March 14, 1904, this decree was affirmed by the Supreme Court of the United States (193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679), and thereupon, viz., on March 22, 1904, the board of directors of the Securities Company adopted the following preambles and resolutions:

"Whereas, in the course of its business, this company has acquired and now holds 1,537,594 shares in the capital stock of the Northern Pacific Railway Company, and 1,181,242 shares in the capital stock of the Great Northern Railway Company; and

"Whereas, in a suit brought by the United States against this company, the said railway companies, and others, this company has been enjoined from voting upon the shares of either of the said railway companies, and each of the said railway companies has been enjoined from paying to this company any dividends upon any of the shares of such railway company, held by this company; and

"Whereas, this company has issued, and there are now outstanding, 3,954,000 shares of its own capital stock; and

"Whereas, this company desires and intends to comply with the decree in the said suit fully and unreservedly, and without delay:

"Resolved, in consideration of the premises, it is declared necessary and desirable for this company so to reduce its present stock as will enable it, without delay, in connection with such reduction, to distribute among its shareholders the shares of capital stock of said railway companies held by it.

"Resolved, that the board of directors of this company hereby declares it advisable that article (4th) of this company's certificate of incorporation be amended, so as to read as follows:

" 'Fourth.—The capital stock of this company is hereby reduced to three million nine hundred fifty-four thousand dollars ($3,954,000), and shall hereafter be three million nine hundred and fifty-four thousand dollars ($3,954,000), divided into thirty-nine thousand five hundred forty (39,540) shares of one hundred dollars ($100) each. Such reduction of capital stock shall be accomplished by each holder of outstanding shares of this company's stock surrendering to the company, for retirement, ninety-nine (99) per centum of the

shares held by him. Upon the surrender to this company, by any shareholder, of the entire number of shares, and parts of shares of this company's stock, which he is hereby required to surrender, this company will assign to him, for each share so surrendered, thirty-nine dollars and twenty-seven cents ($39.27) of the stock of the Northern Pacific Railway Company, and thirty dollars and seventeen cents ($30.17) of the preferred stock of the Great Northern Railway Company, and proportional amounts thereof for fractional shares of the stock of this company. The board of directors or executive committee from time to time shall make such rules and regulations as it shall deem necessary or convenient for carrying out the provisions hereof, and all matters pertaining to the surrender and retirement of the stock of this company, or to the assignment and transfer of the stocks of the said railway companies, hereby contemplated, shall be under the direction of the board. For the purposes hereof, the stockholders of this company, and the number of shares held by them, respectively, shall be determined from the stock transfer books of the company, which, for such determination, shall be closed at a day and hour to be determined by resolution of the board.'

"Resolved, that a meeting of the stockholders of this company for the purpose of taking action upon the said alteration of the certificate of incorporation of this company, and also upon such other business as may come before the meeting, be, and is hereby, called, to be held at the general offices of this company in the city of Hoboken, county of Hudson, and state of New Jersey, at 11 o'clock a. m. on April 21, A. D. 1904."

Notice of a meeting of the stockholders of the Securities Company was accordingly given, and such meeting was duly held upon April 21, 1904. At that meeting the stock of the company was reduced 99 per centum, and the proposed pro rata distribution of the stock of the Northern Pacific Railway Company and of the preferred stock of the Great Northern Railway Company to and amongst the shareholders of the Securities Company was assented to. This was followed by the institution of the present suit, wherein the complainants alleged "that the defendant Northern Securities Company threatens and intends to distribute the shares of stock of each of said Great Northern and Northern Pacific Railway companies pro rata amongst its stockholders in disregard of the rights of your orators, and that, if said defendant Northern Securities Company be not enjoined from so doing by this court, such distribution will be forthwith made, and the stock of the Northern Pacific Railway Company belonging to your orators, and to which they are entitled, will be lost to your orators. * * *" The bill accordingly prayed for an injunction, and thereupon, and on affidavits and exhibits, the injunction now in question was awarded.

The appellees averred in their bill, and their counsel have contended in argument, that the shares of railway stock in question were acquired by the Securities Company under and subject to an alleged agreement (which will be presently more particularly referred to) that it would hold them "as custodian, depositary, or trustee," and that the "legal and equitable owners of said shares of stock of said railway companies were and are the several parties who originally exchanged the same for stock of the Northern Securities Company, or their assigns." On the other hand, the appellant, the Securities Company, insists that it acquired the railway shares referred to by absolute purchase thereof, and that consequently it became and now is vested with the equitable as well as the legal title thereto. The issue thus presented is of primary importance, and the proofs leave us in no doubt as to the facts upon which it must be determined. That the transaction, at least in

form, and prima facie in substance, was one of purchase and sale, is manifest. The resolution which authorized the acquisition of the railway stock on behalf of the Securities Company was adopted by its board of directors at a meeting at which Mr. Harriman was present as a member of the board, and the only authority it conferred was "to purchase said stock * * * at an aggregate price of $91,407,500, payable, as to $82,491,871 thereof, in the fully paid-up and nonassessable shares of the capital stock of this company at par, and as to $8,915,-629 in cash." It is obvious that this resolution contemplated a "purchase," and not a bailment or trust; and that it accurately stated the nature and terms of the contract which was actually made by and with the Securities Company is unequivocally shown by what was done in pursance of it. The railway shares were unconditionally assigned to that company. The price specified in the resolution was paid by it, and this payment was made partly in cash and partly in shares of its own stock, for which corporate certificates in the ordinary form were delivered and accepted. The cash so paid, which amounted to about $7,522,000, was (as is stated in the bill) "used for the purchase of other property and for corporate purposes." The complainants received dividends upon the stock that was issued to them, which were paid out of the general funds of the Securities Company; and by its indenture to the Equitable Trust Company of New York the Oregon Short Line Railroad Company irrefutably asserted its ownership of the Securities Company stock which it thereby pledged. It is claimed, however, that notwithstanding these facts the beneficial interest in the railway stock was not transferred to the Securities Company, because, as the appellees allege, the transfer was made under the terms of an agreement which they say was made by James J. Hill, J. Pierpont Morgan, and others, owning or controlling a majority of the capital stock of the Great Northern Railway Company, and a majority of the common capital stock of the Northern Pacific Railway Company, "to organize a holding company, * * * and that said holding company should acquire and permanently hold a majority of the shares of the capital stock of said Great Northern and Northern Pacific Companies, and control the operations and management thereof in perpetuity, and that the then existing holders of such railway shares should deposit the same with said holding company"; and that "in pursuance of said agreement said Northern Securities Company was organized, * * * and forthwith agreed to acquire and hold the shares of said railway stocks, as aforesaid, as custodian, depositary, or trustee, and to issue in exchange therefor its own share certificates upon said agreed basis." The agreement thus set up is not in accord with the documentary evidence which has been referred to, and to establish its existence a clear preponderance of proof should at least be required, whereas, in our opinion, it conclusively appears that no such agreement was ever made. Mr. Harriman himself has distinctly testified that the Northern Pacific stock in question was sold; that the transaction was not an exchange; that he, principally, negotiated the sale; and that there was not attached to the negotiations any condition except as to price. And to the same effect is his affidavit in this case, in which he deposed that he was urged by Messrs. Morgan & Co. to dispose of the Northern Pacific stock held by

the Oregon Short Line Company, and that "they further stated that, upon the organization of the proposed holding company," not that it would take as custodian or trustee, but that "they would be prepared to purchase the holdings of stock of the Northern Pacific owned by the Oregon Short Line, and pay therefor in the stock of the holding company." These statements of that one of the complainants having most knowledge of the subject, confirmed, as they are, by the other evidence, make it quite impossible to believe that the railway stock was received by the Securities Company merely as a custodian or depositary. The only agreement upon which it was transferred was an unqualified agreement of sale, and the fact that the design with which the Securities Company was organized has been compulsorily abandoned has not divested or in any way affected the absolute title which, by executed contract of purchase, it acquired. Undoubtedly, it was anticipated by the complainants, as by all concerned, that the rights ordinarily incident to the ownership of stock, including the right to vote and to receive dividends, would be exercisable as to this stock by the Securities Company. But expectation is not contract, and therefore the frustration of this anticipation cannot be said to have occasioned a failure of consideration. The only consideration agreed upon was payment of the price, and admittedly that payment was made. The situation, then, is this: The Northern Securities Company is the owner of 1,537,594 shares of the stock of the Northern Pacific Railway Company, and 1,181,242 shares of the stock of the Great Northern Railway Company, which it has been restrained, at the suit of the United States, from voting or receiving dividends upon, and in view of this restraint all parties agree that it should not continue to hold them. It accordingly proposes to assign them pro rata to its shareholders, including not less than 2,500 persons, whose shares were unquestionably acquired by purchase, and who are not parties to this suit; and as such disposition of them would effect a ratable, and therefore equitable, division of them amongst all who are entitled to participate in a distribution of the corporate assets, we are of opinion that the injunction which prohibited it should no longer remain in force.

If the question before us had been involved and decided in the suit of the United States v. The Northern Securities Company, or if it had been passed upon, though but incidentally, by the Supreme Court of the United States in disposing of the appeal in that case, we, of course, would not regard it as an open one. But it was neither decided nor considered at any stage of that litigation. The petition or bill of the United States did pray, inter alia, that the stockholders of the railroad companies who had exchanged their stock therein for stock of the Northern Securities Company should be required to surrender any stock of the Northern Securities Company so acquired and held by them, and to accept therefor the railway stock "in exchange for which the same was issued"; but the decree, in so far as it was mandatory, went no further than to prohibit the doing of "the specific things which, being done, would effect the result denounced by the act." 193 U. S. 356, 24 Sup. Ct. 465, 48 L. Ed. 679. This was all that was requisite, and it was accomplished by that part of the decree which has been already quoted; and the added clause, though apparently suggested

by the prayer of the bill to which we have referred, was obviously not intended to have any obligatory effect. It was permissive merely, and this so plainly appears from its terms that it is necessary only to direct attention to them. They are: "But nothing herein contained shall be construed as prohibiting the Northern Securities Company from returning and transferring to the stockholders of the Northern Pacific Railway Company and the Great Northern Railway Company, respectively, any and all shares of stock in either of said railway companies which said the Northern Securities Company may have heretofore received from such stockholders in exchange for its own stock; and nothing herein contained shall be construed as prohibiting the Northern Securities Company from making such transfer and assignment of the stock aforesaid to such person or persons as may now be the holders and owners of its own stock originally issued in exchange or in payment for the stock claimed to have been acquired by it in the aforesaid railway companies." This decree was affirmed in its entirety, and without modification, and thereafter the three principal complainants in the present case applied to the Circuit Court for the District of Minnesota for leave to intervene in the suit in which it had been made. The ground of that application was substantially the same as that upon which this bill is founded; but in denying it the court said:

"The decree was wholly prohibitory. It enjoined the doing of certain threatened acts, and so long as these acts are not done it enforces itself, and no further action looking to its enforcement is deemed essential. In its bill of complaint the United States prayed, among other things, for a mandatory injunction against the Securities Company requiring it to recall and cancel the certificates of stock which it had issued and to surrender the stock of the two railway companies in exchange for which its stock had been issued. This prayer for relief was denied. The court doubted its power to command stockholders of the Securities Company, who had not been served with process, and were not before the court otherwise than by representation (if, indeed, they were present by representation), to surrender stock which was in their possession and to take other stock in lieu thereof. It accordingly contented itself with an order which rendered the stock of the two railway companies, so long as it was in the hands of the Securities Company, valueless for the purpose of carrying out the objects of the unlawful combination in restraint of interstate trade. The government was satisfied with the relief which it obtained, and expresses itself as fully satisfied therewith at the present time. * * * It is true that the decree contained a provision, in substance, that nothing therein contained should be construed as prohibiting the Securities Company from returning to the stockholders of the Northern Pacific Railway Company and the Great Northern Railway Company any and all shares of stock in either of said railway companies which the Northern Securities Company had acquired in exchange for its own stock, and that nothing therein contained should be construed as prohibiting the Securities Company from making such transfer of the stock aforesaid to such person or persons as had become the owners of its own stock originally issued in exchange for stock in the two railway companies. But this provision was merely permissive. It did not command that the stock should be returned, or exclude other methods of disposing of it that, in view of all the circumstances, might appear to be more equitable. The fact that the directors of the Securities Company have proposed to its stockholders a plan of distributing the stock of the two railway companies in a manner somewhat different from that which was tentatively suggested by the decree, but not commanded, cannot be regarded as a failure to obey the decree. It was said in argument that one purpose of the intervention is to have that clause of the decree which is now merely permissive made mandatory. But this would be to modify the provisions of a decree which has now become final by affirmance, and make an order which we ex-

pressly, and on full consideration, declined to make when the decree was entered. This we must decline to do."

The facts which have been mentioned negative the contention that the question here in dispute was adjudicated in the government suit, and the further contention that it was at least authoritatively dealt with in the principal opinion rendered upon the appeal in that case is, we think, likewise fallacious. Some phrases in that opinion, if considered separately, and without reference to the precise subject which was under investigation, may seem to sanction the interpretation which the appellees have sought to put upon it; but when it is read as a whole it becomes quite evident that it was not intended to resolve any question other than that which was before the court. The decree that was under review had enjoined the Securities Company from using the railway shares in furtherance of the scheme declared to be unlawful, but, as we have seen, the right of property in those shares was not at all affected by that decree.

"The Circuit Court has done only what the actual situation demanded. Its decree has done nothing more than to meet the requirements of the statute. It could not have done less without declaring its impotency in dealing with those who have violated the law. The decree, if executed, will destroy, not the property interests of the original stockholders of the constituent companies, but the power of the holding corporation, as the instrument of an illegal combination of which it was the master spirit, to do that which, if done, would restrain interstate and international commerce. The exercise of that power being restrained, the object of Congress will be accomplished; left undisturbed, the act in question will be valueless for any practical purpose." 193 U. S. 357, 24 Sup. Ct. 465, 48 L. Ed. 679.

We have been asked to infer from this statement in the opinion that the learned justice who made it intended to affirm that the property interests of the original holders of the railway shares had not been transmuted by their assignment; but no such inference would be warranted. He was not dealing with conflicting claims of title, but with the decree of the Circuit Court; and the plain and natural meaning of the language used is that by that decree no property interests had been disturbed. As was said by the learned judges who made it:

"When the decree was entered it was assumed by the court that when the stock was thus rendered valueless in the hands of the Securities Company the stockholders of that company would be able, and likewise disposed, to make some disposition of the stock which, under all the circumstances of the case, would be fair and just, and would restore it to the markets of the world, where it would have some value, instead of being a worthless commodity. It was thought that the duty of thus disposing of it could be safely left to the stockholders of the Securities Company, and that, if any controversy arose in the discharge of this function, in view of the situation that had been created by the decree, it would be a controversy that would properly form the subject-matter of an independent suit between the parties immediately interested."

The present suit is an independent one, and, as its subject-matter is distinctly different from that of the suit in which the United States was complainant, the duty of this court to independently consider it has seemed to us to be both plain and imperative.

The conclusions reached upon the questions we have discussed render it unnecessary for us to express any opinion upon the other points argued by counsel. From what has been said it follows that the decree of the Circuit Court must be reversed, and therefore it is so ordered.

GRAY, Circuit Judge (dissenting).   I am constrained to dissent from the judgment of the majority of the court.   I do not think the learned judge of the court below exercised other than a sound judicial discretion in granting the motion for a special injunction, pendente lite.   He has stated in his opinion that important and doubtful questions of law and fact had been raised by the pleadings and affidavits, and I cannot agree that these questions should have been so determined by him on a motion for a preliminary injunction, as to make necessary the dismissal of the bill.   I say, to make necessary the dismissal of the bill, because it is apparent that, to have denied the injunction pendente lite, and thus to have permitted the distribution of the stocks of the Northern Pacific and Great Northern, in the custody and control of the defendant company, according to the plan proposed, would have practically frustrated the object of the suit, and have rendered unavailing a decree, as prayed for, in favor of complainants.   Nothing but a clear conviction that complainant's bill was without equity, and should therefore be dismissed without further hearing, would have justified the court below in refusing the preliminary injunction.   On the other hand, if the court were satisfied that a prima facie case had been presented by complainants, and that the balance of advantage or disadvantage to result to the parties respectively from the granting or withholding an injunction was such as to sanction such action, it was the exercise of a sound judicial discretion to grant the injunction and preserve the status quo, until there was opportunity, after full hearing, in the orderly progress of the suit, to consider, with the deliberation they demanded, the questions of law and fact raised by the pleadings and evidence in the case. The responsibility for the exercise of this power and duty rested upon the court below.

Upon appeal from an order granting a preliminary injunction, a reviewing court is not called upon, ordinarily, to enter into and decide the merits of the case, and unless the court below, in granting the preliminary injunction, has violated some rule of equity or abused its discretion, or acted improvidently, this court should not interfere with its discharge of the responsibility and duty imposed upon it.   "The right to exercise this discretion has been vested in the trial courts.   It has not been granted to the appellate courts, and the question for them to determine is, not how they would have exercised this discretion, but whether or not the courts below have exercised it so carelessly or unreasonably that they have passed beyond the wide latitude permitted them, and violated the rules of law which should have guided their action."   That there was no such abuse of discretion in this case by the learned judge of the court below, will, I think, be apparent from his own statement, and from the admission made to that effect by the majority of the court. It seems to me clear that he should be afforded the untrammeled opportunity he sought, for a full hearing and deliberate investigation of what he has stated to be the important and doubtful questions of law and fact presented by this record.   Such a course would be consonant with the genius of our judicial system, by not depriving the parties, or a reviewing court, of the benefit to result from the examination and judgment of a court of first instance.   This salutary feature of our system would be measurably lost, if the right to appeal from an interlocutory

decree for a special injunction, given by the act of Congress, should be so construed as to allow courts of first instance to refer, and the appellate courts to assume, the determination of questions arising on motions for such injunctions. I cannot accept the view, that it is our duty in the case at bar to do more than merely determine whether the sound judicial discretion of the court below has or has not been abused, declining to consider what ought to be the decision on the merits at final hearing. I do not think that the established general rule of appellate courts requires more than this, and I think we can conform to this general rule "without in effect renouncing the appellate jurisdiction conferred upon us by Congress."

As I am clearly of the opinion that the court below, in granting the special injunction, pendente lite, has given due consideration and effect to the balance of inconvenience and injury which may result to one party or the other, and that the prima facie case was sufficiently established at the hearing to entitle the complainants to the protection of such an injunction, I am in favor of affirming the interlocutory decree.