Rapid Transit Subway Construction Company, Appellant, *v.* The City of New York, Respondent.

474

(Argued October 6, 1931; decided July 19, 1932.)

*Albert J. Kenyon, Frank D. Allen* and *James L. Quackenbush* for appellant. The trial court erred in holding that the plaintiff was a mere agency or instrumentality of the railroad company and that the acts and conduct of the railroad company in connection with any material phase of the work in question may be considered

and given weight as affecting the rights and duties of the plaintiff under its contract with the city, and in holding that the plaintiff was completely dominated by the railroad company and could be legally charged with any alleged acts or defaults of the railroad company. (*Matter of Brown*, 130 Misc. Rep. 865; *Matter of Green*, 231 N. Y. 237; *Brock* v. *Poor*, 216 N. Y. 387; *Elenkrieg* v. *Siebrecht*, 238 N. Y. 254; *Peterson* v. *C., R. I. & Pac. R. R. Co.*, 205 U. S. 364; *Owl Fumigating Corp.* v. *California Cyanide Co.*, 24 Fed. Rep. [2d] 718; 30 Fed. Rep. [2d] 812; *Kingston Dry Dock Co.* v. *Lake Transportation Co.*, 31 Fed. Rep. [2d] 265; *Pullman Palace Car Co.* v. *Missouri Pac. Ry. Co.*, 115 U. S. 587; *United States* v. *D. & H. R. R. Co.*, 213 U. S. 414; *Berkey* v. *Third Ave. R. R. Co.*, 244 N. Y. 84; *Stone* v. *Cleveland, C., C. & S. L. Ry. Co.*, 202 N. Y. 352; *United States* v. *D., L. & W. R. R. Co.*, 238 U. S. 516; *McKay Co.* v. *Savery Hotel Co.*, 184 Iowa, 260; *Union Sulphur Co.* v. *Freeport Texas Co.*, 251 Fed. Rep. 634.) The trial court erred in dismissing plaintiff's claim for interest as damages on amounts of money admittedly due plaintiff under the terms of its contract from the date of payment fixed by the contract until the date of payment; such damages arising because of defendant's breach of its contract in failing on completion of the work to state from actual measurements the whole amount of work done by plaintiff and the amount due it and to make payment within ninety days. (*Matter of Burke*, 191 N. Y. 437; *Canadian Car & Foundry Co.* v. *American Can Co.*, 258 Fed. Rep. 363; *Holden* v. *Freedman's Sav. & T. Co.*, 100 U. S. 72; *Lowe* v. *Turpie*, 37 L. R. A. 223; *Leopold* v. *City of New York*, 184 App. Div. 244; 229 N. Y. 555; *Grote* v. *City of New York*, 190 N. Y. 235; *Tuzzeo* v. *American Bonding Co.*, 226 N. Y. 171; *Bradley* v. *McDonald*, 157 App. Div. 572; 218 N. Y. 351; *Roebling's Sons Co.* v. *City of New York*, 110 App. Div. 366; *McGovern* v. *City of New York*, 202 App. Div. 317; 235 N. Y. 275; 236 N. Y. 508.) The trial

court erred in holding as a matter of law that plaintiff was entitled to interest on claims allowed by the court only for the period from the date of filing plaintiff's claim with the Comptroller of the defendant to date of judgment. (*Shepard* v. *City of New York*, 216 N. Y. 251; *McGovern* v. *City of New York*, 202 App. Div. 317; 235 N. Y. 275; *Roebling Sons* v. *City of New York*, 110 App. Div. 366; *Brooklyn Public Library* v. *City of New York*, 222 App. Div. 422; 250 N. Y. 495.)

*Arthur J. W. Hilly, Corporation Counsel* (*Charles Blandy, Willard S. Allen, Frank R. Rubel* and *Charles V. Nellany* of counsel), for respondent. The plaintiff, in the doing of the work, was a mere agency or instrumentality of the railroad company, and the acts and conduct of the railroad company, under the contract, may be considered, and given weight, as affecting the rights and duties of the plaintiff under its contract with the city. (*Chicago, M. & St. P. Ry.* v. *Minnesota Civic Assn.*, 247 U. S. 490; *Title Guarantee & Trust Co.* v. *Pam*, 232 N. Y. 441; *Berkey* v. *Third Ave. R. R. Co.*, 244 N. Y. 84; *Davis* v. *Alexander*, 269 U. S. 114.) No error was committed by the trial court in dismissing the plaintiff's claims for interest on the various amounts of money or in holding that plaintiff was entitled to interest, on certain of its claims, only from the date when the plaintiff filed these claims with the Comptroller of the city of New York. (*Dock Contractor Co.* v. *City of New York*, 296 Fed. Rep. 377; *Taylor* v. *Mayor*, 67 N. Y. 87; *Sweeny* v. *City of New York*, 173 N. Y. 414; *Ryan* v. *City of New York*, 179 App. Div. 181; *O' Keeffe* v. *City of New York*, 176 N. Y. 297; *Smith* v. *Board of Education*, 208 N. Y. 84; *McGovern* v. *City of New York*, 236 N. Y. 508; *Litchfield Const. Co.* v. *City of New York*, 244 N. Y. 251.) The trial court correctly disallowed and dismissed plaintiff's claim for $4,665.05 for ducts through manholes. (*Hopkins* v. *City of New York*, 217 App. Div. 790.)

LEHMAN, J. On or about August 7, 1914, the city of New York, acting by the Public Service Commission, entered into a contract with the plaintiff, Rapid Transit Subway Construction Company, whereby the plaintiff agreed to furnish at unit prices all the labor and materials necessary for the construction of a part of the Seventh Avenue-Lexington Avenue Rapid Transit Railroad, known as Route 5, Section 7, in accordance with the terms of the contract and the plans and specifications incorporated in it.

The contract required the plaintiff to begin actual work within sixty days after the date of delivery of the contract and to complete the work within thirty-one months after such delivery and, in the event of delay in completion of the work, " beyond the period prescribed or beyond the period to which such time may be extended by resolution of the Commission for good cause shown," the plaintiff agreed to pay the sum of three hundred dollars as stipulated damages for each day's delay. According to the certificate of the engineer of the Public Service Commission the work was completed on November 1st, 1918, more than eighteen months after the expiration of the period prescribed in the contract, but the Commission duly extended that period by resolution.

The contract provides that " whenever in the opinion of the Engineer the Contractor shall have completely performed the contract the Engineer shall so certify in writing and in duplicate to the Commission, and in his certificate shall state from actual measurement the whole amount of work done by the Contractor * * *. Upon the receipt of such certificate the Commission shall forthwith prepare and certify two final vouchers * * *. One of such final vouchers shall be payable by the City. * * * The City shall pay the amount due on such voucher payable by it on or before the expiration of ninety (90) days after the acceptance of the work herein agreed to be done by the Contractor and the filing of a

certificate of the completion and acceptance of the work in the office of the Comptroller signed by the Engineer and the Commission."

Promptly after the work was completed the plaintiff requested that a certificate of the completion and acceptance of the work should be prepared and signed. The final certificates and vouchers for payment were not prepared and signed till December 7th, 1920, more than two years after the date of completion.

During the interval the engineer made five partial estimates of the work, theretofore performed by the contractor, for which the contractor had not been paid. The plaintiff received payments aggregating $66,045.44 upon such partial estimates. The final estimate and certificates showed that a balance of $61,119.65 remained due and payable to the plaintiff from the city of New York. The plaintiff claimed that a much larger amount was due for work under the contract and as damages for various alleged breaches by the city of its own obligations under the contract. The contract provides that " The acceptance by the Contractor of the final payment by the City aforesaid  *  *  *  shall be and shall operate as a release to the City from all claim and liability to the Contractor for anything done or furnished for, or relating to the work.  *  *  * " The plaintiff refused final payment for its work and presented its claim to the Comptroller. Then it began this action. Thereafter, under a special agreement with the city, it received from the city the sum of $61,000, leaving only the sum of $119.65 due to it under the final certificate.

The complaint herein sets forth six causes of action involving numerous items of work for which, the plaintiff urges, it has not been paid in accordance with the terms of the contract and, in addition, several claims for damages for alleged defaults by the city under the contract. It demands judgment for sums which, with interest as claimed by the plaintiff, would amount to approximately

one million dollars. After a protracted trial, a verdict in favor of the plaintiff was directed for the sum of $84,949.17. From the judgment entered on that verdict the plaintiff appealed to the Appellate Division which modified the judgment by addition of the sum of $119.65, concededly due to the plaintiff under the final certificate, which through inadvertence had not been included in the original judgment.

Since the defendant did not appeal, we are concerned now only with those claims and items set forth in the complaint which were not allowed in the final certificate and for which recovery was denied by the courts below. The appellant urges that the trial judge erred in denying recovery for a considerable number of unrelated items. Each of these items must be examined separately, but in most instances the questions presented are narrow. The most serious questions, both in the amount involved and in the importance of the governing legal principles, relate to the denial of recovery for alleged neglect of the city in failing to furnish, within a reasonable time, drawings and directions which were required for the prompt and orderly performance of the work.

In *Litchfield Construction Co.* v. *City of New York* (244 N. Y. 251, 261) this court held that, under a similar contract, the city was liable for damages caused to the contractor, by the failure of the engineer of the Commission to furnish, with reasonable promptness, such directions and drawings as under the contract he was required to give. He acts for the city, and a " duty may be implied under such circumstances that he should act with due promptness, and not by delay or other act of commission or omission unreasonably hinder progress." The same rule applies here, and so the trial justice correctly held. The contract was signed in August, 1914. The contractor was required to construct a section of a subway railroad under the street. In the construction of the railroad steel beams and columns were required. Those beams

and columns could be supplied only after they had been fabricated in accordance with " shop drawings " prepared by the contractor and approved by the Commission, and the contractor could not prepare such drawings until the Commission had furnished to it " working drawings " and plans. The section of the subway railroad which the plaintiff was required to erect was, for convenience, divided into seven subsections. Drawings were furnished by the Commission for subsection 5 before the work of excavation, under the contract, was begun. Steel for that subsection was supplied by the mills before the excavation had progressed to the point where the erection of the steel could be begun. Work there proceeded in the order, and according to the method, planned in advance by the contractor, and the work in that subsection was completed within the stipulated period of thirty-one months. The drawings for subsections 1 to 4, to the south of subsection 5, and for subsections 6 and 7 to the north, were received from the Commission between July and December, 1915; *i. e.*, more than fifteen months after the plans were furnished for subsection 5. The evidence produced by the plaintiff indisputably establishes that the delay was due to the fact that the Commission did not even begin the preparation of the necessary drawings till months after the contract was signed. It also appears that, as a result, the work could not be carried on as originally planned and its completion was delayed. Nevertheless the trial court denied the plaintiff any recovery for such delay, on the ground that, in fact, such delay caused no damages, and, at least as to subsections 1 to 4, that the delay was caused rather by the Interborough Rapid Transit Company, which controlled the plaintiff through stock ownership, than by the defendant. We can, in this opinion, state only the salient considerations upon which the trial judge reached these conclusions.

The Interborough Rapid Transit Company was the

record and actual owner of all the stock of the plaintiff, except a few shares which were registered in the names of plaintiff's directors to enable them to qualify. In March, 1913, the city of New York entered into a contract, known as " Contract number 3," with the Interborough Rapid Transit Company, by which that company agreed to share the expense of the construction of a rapid transit railway and to operate the railway, when completed, in conjunction with other routes already operated by it. The earnings of all the routes so operated were then to be placed in a common fund and divided, in the manner specified in the contract, between the city and the company, after certain preferential payments were made to the company.

That contract provides, among other things:

"Article 5. The precise number and the general location of tracks, and dimensions and other characteristics of the railroad, are generally indicated on the contract drawings and plans which bear date the 25th day of January, 1913 * * *. The railroad is to be constructed generally in accordance with such contract drawings and with the specifications (differing, however, so far as necessary to care for varying conditions) included in the form of contract adopted by the Commission on September 1, 1910, for the construction of various sections of Subdivision 1 of the Lexington Avenue Branch.

"Article 6. The Commission reserves the right during the progress of the work of construction to make such modifications, alterations or revisions of the plans or changes in the specifications * * * as may in the judgment of the Commission be found necessary to best serve the public interest."

It was further provided in that contract, as part of article 9, fixing the obligation of the parent company to contribute toward the expense of the construction of the subway, that

" The forms of such construction contracts shall be generally similar to those heretofore adopted by the Commission for the portion of Subdivision 1 of the Lexington Avenue Branch already under construction (differing so far as necessary to provide for varying conditions), except that the Lessee shall also be a party thereto for the purpose of disbursing its contribution toward the cost of construction. Each such contract shall specify an amount to be fixed by the Commission, beyond which the Lessee shall not be liable thereunder. Upon the adoption of the form of contract, together with the specifications and contract drawings, the Commission before advertising· for proposals shall transmit a copy of the same to the Lessee, and within ten (10) days after such receipt, or within such further time as the Commission may allow, the Lessee shall return the same to the Commission with its criticisms or suggestions. The Commission shall thereupon consider any such criticisms and suggestions and its decision thereon shall be final and binding upon the Lessee. Proposals for making such contracts shall then be invited by the Commission in the form and manner required by Section 36 of the Rapid Transit Act."

In conformity with the last quoted provision, before bids were asked for the construction of section 7 of the new subway, the form of the proposed contract, together with specifications and contract drawings, was actually transmitted to the Interborough Rapid Transit Company. The papers were returned by it promptly with a suggestion that the contract should contain certain formal provisions which the company thought necessary for its own protection, but the Rapid Transit Company made no suggestions or criticisms in regard to the specifications or working drawings. Then the Commission advertised for proposals, and the contract was awarded to the plaintiff as the lowest bidder and delivered to it in August.

The Interborough Rapid Transit Company signed

contracts for the construction of sections of the rapid transit railway because it was required under its own contract with the city to pay a part of the cost of construction. Otherwise it undertook no obligations in connection with the construction of the subway. The Rapid Transit Company, which was to operate the railway, when constructed, was interested equally with the city in obtaining contracts for the construction on terms which would provide a suitable railway at as low a cost as possible. Therefore, the city had agreed that before advertising for proposals, the " form of contract with the plans and specifications " should be submitted to the operating company in order to afford that company opportunity for criticism and suggestion. The operating company was under no obligation to the city to make any criticisms or suggestions, if it did not choose to do so for its own benefit. The city did not agree that the Commission would accept any suggestions or criticisms, if made. The obligations of both parties were fully carried out in this regard when the city submitted the form of contract, with drawings or specifications, to the Rapid Transit Company and that company returned them with such suggestions as it chose to make. When contracts were awarded for construction the Public Service Commission, alone, had the duty and the power to prepare further plans and drawings and to give directions for the work.

The " contract drawings " annexed to the contract showed in a general way the location of the tracks, but were, concededly, insufficient to enable orders to be given by the contractor for the fabrication of the steel, and the city was under the duty to furnish other drawings for that purpose, within a reasonable time after the construction contract was executed and delivered. It claims that it could not prepare the necessary drawings until the location of the railway tracks and switches had been definitely determined. The city could fix the loca-

tion of the tracks either alone or after consultation with the Interborough Rapid Transit Company. The contractor, in entering into a contract to construct the railway within a fixed period, had the right to assume that the location of the tracks either had been, or would be, determined in time to permit construction to proceed in an orderly way. Failure of the city, or even the city and the operating company, acting together, to determine the location of the railway tracks would ordinarily not excuse the failure of the city to perform its contractual duty to a contractor who had agreed to build the railway.

The trial judge, though, of course, recognizing the general rule, held that it did not apply in this case in so far as the delay was due primarily to act or neglect of the operating company; because the contractor here is a corporation controlled by, and so closely identified with, the operating company that the separation into two corporate entities should be disregarded and fault of either may be attributed to the other.

Before considering the legal consequences which might fall upon the plaintiff corporation from an act or default of its parent corporation, we must determine how far the acts of the parent corporation contributed to the failure of the city to perform its contractual duty to the subsidiary corporation. The parent company promptly returned to the Commission the "form of contract together with the specifications and contract drawings" which had been submitted to it in April, 1914, pursuant to the terms of Contract No. 3. At that time it made no criticism of the alignment of the tracks, so far as such alignment was shown on the contract drawings, and made no suggestions as to how the tracks and switches should be laid out. Not until October 26th, 1914, did the city or the Public Service Commission again submit to the Interborough Rapid Transit Company any drawings, showing proposed location of the tracks and switches.

Then the Public Service Commission sent to the Interborough Rapid Transit Company "track alignment drawings" for a portion of the route above Forty-second street with a letter stating: "Will you kindly indicate on one set of these plans the speeds at which you propose to operate over the various curves and the *location of the regular and emergency cross-over*." Months of discussion followed as to the proper arrangement of the tracks at that point, before plans were prepared which met with the approval of the Interborough Rapid Transit Company. On March 2, 1915, such plans were at last agreed upon and approved.

Doubtless the Interborough Rapid Transit Company knew, even at the time when the form of contract was submitted to it for criticisms and suggestions, that the location of switches and cross-overs would dictate, to some extent, the position of the steel columns, and thus the length of the space between the columns and of the beams resting upon the columns and necessitate the fabrication of columns and beams of varying weights and size. Therefore, drawings for the fabrication of the columns and beams at such points could not be prepared until the location of the switches and cross-overs was determined. We must assume, for there is evidence to that effect, that the "contract drawings" submitted to the Interborough Rapid Transit Company in April, 1914, with the form of contract showed sufficiently the proposed location of the switches in the subsections north of Forty-second street, to enable that company to criticise those drawings. The courts below have held that then the Rapid Transit Company was under a duty to approve the location of the switches as shown on the drawings or to suggest changes. Since the Rapid Transit Company did not suggest any changes till after more detailed track alignment plans were submitted to it in October, and did not finally approve the amended plans until March, it has been held that the Rapid Transit

Company failed to perform its duty till that date, and the intervening delay was due, wholly, to its fault.

That conclusion rests upon a misconstruction of those provisions of Contract No. 3 between the Interborough Rapid Transit Company and the city to which we have referred above. No duty was thereby placed upon the Rapid Transit Company to criticise the location of the switches or to suggest changes, and when it returned the form of contract and the contract drawings without such criticism, the city might proceed in accordance with those contract drawings and presumably would do so, unless it asked for further criticism or suggestions. If these plans proved defective and later required amendment, such amendment might add to the expense of the construction of the railway. None the less, as we have already pointed out, the Rapid Transit Company assumed no duty to the city to avoid such expense, which both would share. At least until detailed track alignment drawings were again voluntarily submitted to the company in October, the delay in the preparation of working drawings was wholly due to the fault of the Commission, and is not excused by any act or default of the Rapid Transit Company. Until that time neither the plaintiff nor the operating company which controlled the plaintiff, by any act or neglect, hindered the defendant in the performance of its duty to prepare and deliver detailed drawings for the construction of the railway, nor had either lulled the defendant into inaction.

Thereafter the question assumes a different aspect. Even if the Commission was then under no duty to the Interborough Rapid Transit Company to ask further approval of track alignment drawings, it chose to do so, and even if the Interborough Rapid Transit Company was then under no duty to examine the plans and make suggestions for changes, it chose for its own protection to examine the drawings submitted. Having assumed to act, it was then under a duty to act reasonably. There

is some evidence that it delayed unreasonably, and the defendant endeavored to show that this delay was due not merely to negligence but to calculation, because indirectly the operating company would profit through postponement of the date of completion of the construction of the new railway route and the beginning of its operation. We do not analyse that evidence in this opinion. It permits no such inference, and the trial judge stated in his opinion that he would not make such finding. The delay, though not calculated to hinder the progress of the construction work, nevertheless naturally did have that effect, and the Interborough Rapid Transit Company understood that the preparation of the plans and drawings for construction at that point would await a new determination of the location of the tracks.

The plaintiff, demanding damages caused to it by such delay, asserts that it is an entity entirely distinct from the Interborough Rapid Transit Company which owns its stock, and is not concerned with the causes of the delay or chargeable with the act or neglect of the parent company. The city made a contract with it and not with the parent company, and the city has breached that contract. If in truth the plaintiff and the Interborough Company must for all purposes be regarded as distinct and unrelated entities, then there is no escape from the conclusion that proof that the Interborough Company contributed to or even willfully caused that delay, is irrelevant.

A corporation is a creature of the law, endowed with a personality separate and distinct from the personality of those who own its stock and elect its directors. " The corporation in respect of corporate property and rights is entirely distinct from the stockholders who are the ultimate or equitable owners of its assets." (*Brock* v. *Poor*, 216 N. Y. 387, 401.) " Many a man incorporates his business or his property and is the dominant and con-

trolling feature of the corporation. He may do so for the very purpose of escaping personal liability, and he may do so as a cover if in fact the corporation really exists — is doing business as permitted by the laws of this state or the state of its incorporation, in other words, is a person recognized by the law." (*Elenkrieg* v. *Siebrecht*, 238 N. Y. 254, 262.) That is true equally where the corporation is controlled by a natural or an artificial person. Here the plaintiff does exist as a corporation. It has its own assets and property. Some, perhaps all, of its officers are the same persons who occupy similar offices in the parent company; but it maintains its own organization and has an independent life. Its separate personality may not be disregarded. (*Berkey* v. *Third Avenue Ry. Co.*, 244 N. Y. 84.) These rules have been consistently applied where liability for wrong done by the corporation is asserted against a controlling stockholder. Disregard of the dual personality of corporation and stockholder would, in such case, defeat one of the principal purposes for which the law has created the corporation. In some cases, it is true, the owner of corporate stock, who controls the corporation, has been held responsible for the act of the corporation (*Chicago, Milwaukee & St. Paul Ry. Co.* v. *Minneapolis Civic & Commerce Assn.*, 247 U. S. 490; *Davis* v. *Alexander*, 269 U. S. 114), but in those cases the stockholder did not merely use its control of the corporation in the normal and usual manner, but used the corporation as an agent for the transaction of part of the stockholder's business. There liability rested, not upon a disregard of the independent personality of the corporation, but upon the principle of *respondeat superior* applicable even where the agent is a natural person.

The trial judge has found that the plaintiff is a mere agency of the Interborough Rapid Transit Company in the transaction by that company of its corporate business. There is no evidence that the Rapid Transit Company,

though in control of the plaintiff, participated in the management of its affairs in other than the usual and normal manner. It hoped through stock ownership to absorb the profits derived by the plaintiff from the transaction of business, but that business was the plaintiff's business, transacted by it for its own profit, not the business of the Rapid Transit Company transacted by it through the plaintiff's agency. Moreover, even though a principal may be charged with responsibility for the acts of its agent, here the alleged agent has been charged with responsibility for the acts of the alleged principal. The problem here presented is in this respect novel.

We have said: " Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice. (Ballantine, Parent & Subsidiary Corporations, 14 Calif. Law Review, 12, 18, 19, 20.) The logical consistency of a juridical conception will indeed be sacrificed at times when the sacrifice is essential to the end that some accepted public policy may be defended or upheld. * * * At such times unity is ascribed to parts which, at least for many purposes, retain an independent life, for the reason that only thus can we overcome a perversion of the privilege to do business in a corporate form." (*Berkey* v. *Third Avenue Ry. Co.*, *supra*, at p. 95.) Here we are relegated to the " tests of honesty and justice," and no rigid yardstick has ever been fashioned which will measure honesty and justice.

It is not claimed here that the plaintiff is insolvent or even that it has any unpaid creditors. Recovery of damages will eventually enure to the sole benefit of the Rapid Transit Company through its stock ownership. To the extent that such damages are caused by wrongful act or neglect of the Rapid Transit Company, a recovery would enable it to draw profit from its own

wrong at the expense of the city. That result, following from adherence to " the logical consistency of a juridical concept," would clearly constitute a perversion of the privilege to do business in a corporate form. True, for actionable wrong by the Rapid Transit Company, the city might in its turn recover damages from that company, and thus restore to itself some or all of the profit which the Rapid Transit Company had gained by its own wrong. Then, perhaps, the courts might find a means of avoiding multiplicity and circuity of action, without ascribing unity to the corporation and its sole stockholder. We do not now consider such question. Here, as we have pointed out, the Rapid Transit Company was guilty of no wrong towards the city, at least until it delayed approval of the track alignment drawings submitted to it in October, 1914, and it may be doubted whether thereafter even unreasonable delay would constitute an actionable wrong, for the city could have proceeded at any time with the construction, without waiting for such approval.

Undoubtedly, however, the Interborough Rapid Transit Company understood that so long as the alignment drawings were held by it for criticism, and the location of the tracks remained undetermined, no drawings for the fabrication of the steel would be prepared by the city. It knew that though the delay might cause damage to the contractor, the expense, which it must share, of subsequent alteration of the structure because of error in the location of the tracks might thereby be avoided. It chose to participate in delaying the construction rather than to assume the risk of additional expense due to later alteration. If it were itself the plaintiff asking damages for delay under the construction contract, then, clearly, its own acquiescence in that delay would bar recovery. Now recovery for any damages caused by the delay in which it acquiesced and even participated will enure to its own benefit — though even now by the exercise of its control of the plaintiff it might direct the waiver by

the plaintiff of such damages. Exemption from liability for wrong committed by the corporation whose stock it owns is inherent in the privilege, accorded to it by law, of conducting its business in corporate form; exemption from the consequences of its own acts working injustice upon parties with which it deals is a perversion of that privilege. Then, though juridically there is no unity between the corporation and its sole stockholder, the law should not entirely disregard the factual connection between the two. If the parent company were a party to an action in equity, the court might compel it, as controlling stockholder of the corporation, either to reimburse the defendant for the damages caused by delay in which it participated, or, since as sole stockholder it alone will profit by such damages, to cause the corporation to waive such damages. In such case the courts should disregard juridical forms and treat corporation and sole stockholder as a unit, in order that unjust enrichment at the expense of a third party may be avoided. A different solution of the problem might be required if the rights of minority stockholders or creditors were affected. That we do not decide now. The courts below erred in holding that the entire delay in the preparation of the drawings was due to the wrong of the Rapid Transit Company, but the plaintiff should not be allowed to recover damages for delay or neglect of the city after the retention and examination by the Rapid Transit Company of the track alignment plans submitted to it in October, 1914, in so far as the Rapid Transit Company participated or acquiesced in such delay to serve its own purposes.

What we have said applies only to delay in preparing the drawings for subsections 1 to 4. The delay in preparing drawings for subsections 6 and 7 was due, so far as this record shows, solely to the fault of the Commission. There no change in the location of the tracks and switches was considered, and the Rapid Transit Company did

not participate or acquiesce in the delay. Recovery was denied the plaintiff for that delay on the ground that the delay caused no damages. We find that the evidence shows conclusively that the delay did cause damage.

The contract provided (Section 18): " No work shall be begun until the Commission shall issue to the contractor a permit authorizing him to proceed. No permits for excavation will be issued until the contractor has given satisfactory assurance to the engineer that the structural iron and steel and other material needed for construction will be available. The contractor must conduct his work so as to avoid advancing the excavation at any place ahead of the delivery on the work or on property owned or leased by the City of the structural iron and steel required for such place, unless otherwise permitted by the Engineer. If the contractor elects and is permitted to advance the excavation ahead of such iron and steel delivery, it will become necessary for him to support and maintain the trenches until the iron and steel can be obtained; this he shall do entirely at his own risk and expense. The permits are to be in such form and shall cover such portions of the work as the Commission shall prescribe."

The meaning of this provision is clear. It contemplated that deliveries of structural iron and steel would be made as the excavation proceeded, so that the necessity of erecting temporary timber support for the trenches and the street surface would be avoided, but if such delivery was not made, the contractor might, with the permission of the engineer and at his own risk and expense, continue the work of excavation. In this case, the contractor promptly began the excavation, relying upon the obligation of the city to furnish drawings, in time for the contractor to order the steel and obtain delivery as the excavation proceeded. In December, 1914, it became evident that the work could not proceed in the manner originally contemplated, and though no special permit was

given to the contractor, it was allowed to proceed with the excavation and protect the work by timbers. In that way it was hoped the completion of the work would be facilitated. In September, 1915, the plaintiff abandoned further excavation.

At that time a large part of the excavation had been completed by the use of the so-called timbering process, which is used when excavation and steel construction do not proceed simultaneously, and the street surface over the parts excavated was supported by timber. There is evidence that if the contractor had not abandoned further excavation at that time, it could have continued the steel work expeditiously after the steel was delivered, and in that way could have completed the contract without substantial delay. Therefore, the trial judge held that delay in the delivery of the drawings caused no damage for which the city must respond.

That conclusion is not supported by the evidence. Assuming that the delay in furnishing the drawings would have caused the plaintiff no damage if it had proceeded to complete the excavation, using the timbering method, it did concededly cause damage when that method was abandoned, and the question remains whether the plaintiff was justified in abandoning that method. In September, 1915, on another branch of the new subway which was being constructed by other contractors by the same method, there was a serious cave-in. A surface car passing over the street above a trench which was supported by temporary timber construction fell into the trench, with a large loss of life. Then both the contractor and the city began to question the safety of the timbering method of construction. There were numerous conferences between the plaintiff's engineers and the city's engineers. One of the plaintiff's engineers stated that the plaintiff could and should proceed with the excavation. All the others disagreed with him, and the plaintiff stopped further excavation. It is said in

the city's brief that the evidence would support a finding that this change of construction was done for purposes of delay. That is not the fact. Although no formal order was given by the city to stop this construction, it is not disputed that informal orders were given, and so the trial judge stated in his opinion. Nevertheless, he found that the plaintiff, having undertaken to proceed in advance of delivery of steel, by the use of timbering supports, made an " election " under the terms of the contract, and cannot complain because subsequent events made that election unprofitable. If the so-called election had been made voluntarily by the plaintiff for its own profit, and the city had permitted the plaintiff to finish the construction in the manner " elected " by the plaintiff, the conclusion of the trial justice would have been correct, but since the so-called election was forced upon the plaintiff by the city and did not delay the completion of the work, and the city itself refused to permit completion under the system elected, it seems plain that the conclusion of the trial judge that the contractor was not damaged by the delay in furnishing the drawings is not supported by the evidence.

We have examined with care all the claims of the plaintiff that recovery for other items alleged in the complaint was erroneously denied, though space cannot be found in this opinion for detailed analysis. We find error in regard to only one other claim. The engineer should have included in his measurement of " duct feet," for which the contractor was entitled to payment under Schedule Item 127, the space within the manholes which form an integral part of the ducts for electric wires. The judgment should include the sum of $4,665.05 for this item.

The only question which we must still consider is whether interest on all sums due to the plaintiff from the city runs from the date when the claim was filed with the Comptroller or whether the city is liable for interest on

these sums, as well as interest upon the value of securities withheld, from an earlier date. In *Taylor* v. *Mayor of New York* (67 N. Y. 87, 94) this court held that no interest could be allowed on a contractual claim for salary until after demand upon the disbursing officer of the city. There we said: " The city government is not required to seek out those who have claims against it, and pay them even when due. It is to be presumed that all proper liabilities will be paid upon demand. The Charter prohibits any action against the city until thirty days after the claim has been presented to the Comptroller." The rule that interest will not run against the city until demand upon the disbursing officer has been reiterated in subsequent cases. (*Sweeny* v. *City of New York*, 173 N. Y. 414; *O' Keeffe* v. *City of New York*, 176 N. Y. 297.) In *Smith* v. *Board of Education* (208 N. Y. 84, 86) the same rule was applied in an action against the Board of Education, the court stating: " It must be regarded as well settled that a claim against a municipality, although liquidated and due at a definite date, does not draw interest until demand has been made for its payment, unless it is otherwise agreed. This rule is independent of any statutory requirement such as the familiar one that notice of claim must be served on the municipality some time before suit can be commenced thereon." In no subsequent case has this court consciously departed from that rule, although, perhaps, cases might be cited where the appellants failed to suggest this point adequately, and judgments which included interest running from an earlier date have been affirmed.

The plaintiff urges that a different rule should be applied in this case, because it made timely demand for a final certificate upon the engineer, and that officer delayed in furnishing the certificate for over two years. Under the terms of the contract there was nothing due to the plaintiff from the city until ninety days after the engineer had given the final certificate. The engineer

had a reasonable time to grant such a certificate, and it may be that after refusal to grant a certificate or delay so long continued as to amount to a refusal, the plaintiff could bring an action without procuring the certificate. Nevertheless, the demand on the engineer for a certificate was not a demand for the payment of an accrued claim upon an officer of the city authorized to pay claims. Until the claim was filed with the Comptroller, no such officer had any notice that any moneys were due to the plaintiff, and certainly no officer had been called upon to pay the plaintiff's claim. It follows that the courts correctly held that interest on the plaintiff's claim runs only from the date when the claim was filed with the Comptroller, and demand made upon him.

The action should be severed and the judgments of the Appellate Division and the Special Term, in so far as they deny recovery upon the causes of action for delay of the city in furnishing drawings and directions, should be reversed and a new trial granted, with costs to abide the event. The judgments of the Appellate Division and of the Special Term upon the remaining causes of action should be modified by including in the amount awarded to the plaintiff the sum of $4,665.05, with interest from the date of demand, and as modified affirmed, with costs to the appellant.

Pound, Ch. J., Crane, Kellogg, O'Brien and Hubbs, JJ., concur.*

Judgment accordingly.

---

* Cardozo, Ch. J., heard the argument but resigned before the decision; Crouch, J., was not a member of the court at the time of argument, hence did not participate in the decision.