[18 NE3d 359, 993 NYS2d 648]

VILLAGE OF ILION et al., Plaintiffs, and VILLAGE OF HERKIMER, Appellant, v COUNTY OF HERKIMER, Individually and as Administrator of the HERKIMER COUNTY SELF-INSURANCE PLAN, Respondent, et al., Defendants.

Argued March 27, 2014; decided May 1, 2014

## POINTS OF COUNSEL

*Longstreet & Berry, LLP*, Syracuse (*Martha L. Berry* and *Michael J. Longstreet* of counsel), for appellant. I. Future damages should have been discounted to present value. (*Toledo v Iglesia Ni Christo*, 18 NY3d 363; *Greenburgh Eleven Union Free School Dist. v National Union Fire Ins. Co. of Pittsburgh, PA*, 304 AD2d 334; *Admae Enters. v 1000 N. Blvd. Corp.*, 104 AD2d 919; *Dunn v Consolidated Rail Corp.*, 125 AD2d 228; *Ammar v United States*, 342 F3d 133; *Jones & Laughlin Steel Corp. v Pfeifer*, 462 US 523; *Ramirez v New York City Off-Track Betting Corp.*, 112 F3d 38; *Randall-Smith v 43rd St. Estates Corp.*, 17 NY2d 99.) II. Prejudgment interest should not have been awarded on future damages. (*155 Henry Owners Corp. v Lovlyn Realty Co.*, 231 AD2d 559; *Milbrandt v Green Refractories Co.*, 79 NY2d 26; *Pay v State of New York*, 87 NY2d 1011; *Krumenacker v Gargano*, 276 AD2d 750; *Moorer v City of New York*, 272 AD2d 79; *Randall-Smith v 43rd St. Estates Corp.*, 17 NY2d 99.) III. The trial court's decision to refuse to allow discounting and to award prejudgment interest on undiscounted future damages was punitive. (*Toledo v Iglesia Ni Christo*, 18 NY3d 363.) IV. Prejudgment interest should not have been awarded from December 31, 2005. (*Rapid Tr. Subway Constr. Co. v City of New York*, 259 NY 472; *Smith v Board of Educ. of City of N.Y.*, 208 NY 84; *O'Keeffe v City of New York*, 176 NY 297; *Sweeny v City of New York*, 173 NY 414; *Taylor v Mayor*, 67 NY 87.)

*Hinman, Howard & Kattell, LLP*, Binghamton (*Albert J. Millus, Jr.*, of counsel), for respondent. I. The trial court properly determined that, under the unique circumstances of this matter, the jury should not reduce the amounts of its verdict. (*United States v Bowler*, 252 F3d 741; *Matter of Aides At Home, Inc. v State of N.Y. Workers' Compensation Bd.*, 76 AD3d 727; *Pikas v Town of Grand Is.*, 106 AD2d 887; *Matter of Peachtree Settlement Funding, LLC v Ramirez*, 38 Misc 3d 1202[A], 2012 NY Slip Op 52330[U]; *Jones & Laughlin Steel Corp. v Pfeifer*, 462 US 523; *Ammar v United States*, 342 F3d 133; *Ramirez v New York City Off-Track Betting Corp.*, 112 F3d 38; *Toledo v Iglesia Ni Christo*, 18 NY3d 363; *Pay v State of New York*, 87 NY2d 1011; *Greenburgh Eleven Union Free School Dist. v National Union Fire Ins. Co. of Pittsburgh, PA*, 304 AD2d 334.) II. The lower courts properly awarded prejudgment interest on the undiscounted verdict amounts. (*Jemzura v Jemzura*, 36 NY2d 496;

*Anesthesia Group of Albany v State of New York*, 309 AD2d 1130; *Bourke v Albany Med. Ctr.*, 176 AD2d 1028; *United States Fire Ins. Co. v Federal Ins. Co.*, 858 F2d 882; *Gellman v Hotel Corp. of Am.*, 46 Misc 2d 521; *155 Henry Owners Corp. v Lovlyn Realty Co.*, 231 AD2d 559; *Milbrandt v Green Refractories Co.*, 79 NY2d 26; *Pay v State of New York*, 87 NY2d 1011; *Moorer v City of New York*, 272 AD2d 79; *Krumenacker v Gargano*, 276 AD2d 750.) III. The trial court's award of prejudgment interest was not "punitive." IV. The courts below properly awarded interest from December 31, 2005. (*Acme Bldrs. v County of Nassau*, 36 AD2d 317, 31 NY2d 924; *Taylor v Mayor*, 67 NY 87; *Rapid Tr. Subway Constr. Co. v City of New York*, 259 NY 472; *O'Keeffe v City of New York*, 176 NY 297; *Zeiser v Cohn*, 207 NY 407.)

### OPINION OF THE COURT

Chief Judge LIPPMAN.

The primary issue in this breach of contract action is whether a municipality's liability upon withdrawing from a county self-insurance fund should have been discounted to present value. Under the circumstances presented, we hold that the withdrawal fee reflected benefits to be paid in the future and therefore should have been discounted to its current value as of the date it was due.

The case arises out of a dispute over the administration of a workers' compensation self-insurance plan (Plan) administered by defendant-respondent Herkimer County (County). In 1956, the County created the Plan pursuant to article 5 of the Workers' Compensation Law. By 2005, the participants included 32 cities, towns, and villages, including plaintiff Village of Herkimer (Village). The terms of the Plan were dictated by local law (*see* Local Law No. 2 [2005] of County of Herkimer; Local Law No. 4 [1995] of County of Herkimer). Rather than purchasing private insurance, the participants pooled their funds to administer and pay for all of their workers' compensation claims. Each year the Plan administrator estimated the Plan's costs for the upcoming year and apportioned them among the participants. The apportionment was based on a formula contained in the Plan, which, following the adoption of a 1978 amendment, was based partially on the property taxes levied by each municipality, and partially on a valuation of each participant's workers' compensation claims.

Participants in the voluntary Plan could withdraw at the end of any calendar year by giving notice of withdrawal by the pre-

ceding July 1 and by paying "an equitable share of the outstanding liabilities of the plan as of the date of withdrawal" (Workers' Compensation Law § 65 [1]; *see also* Local Law No. 4 [1995] of County of Herkimer). Although neither the Plan nor the Workers' Compensation Law provided a mechanism for determining the Plan's "outstanding liabilities," the Plan followed the standard practice in the insurance industry of obtaining an actuarial assessment, also known as a reserve analysis. So, for example, when the Town of Webb gave notice in 2003 of its intention to withdraw from the Plan, the County hired an actuarial firm to estimate the Plan's liabilities as of June 30 of that year. The 2003 reserve analysis estimated the total "projected liabilities" at almost $8.9 million, on an "undiscounted basis." The report also provided examples of "discounted liabilities" tied to various interest rates, including approximately $7.7 million (2% interest rate), $7.3 million (3%), and $6.9 million (4%). The 2003 reserve analysis explained the basis for the discounted amounts as follows:

> "The timing of payments and the time value of money are reflected in the discounted values . . . . The effect of investment income is determined by applying a payout pattern and an assumed interest rate to projected ultimate loss, [expenses] and assessments in order to calculate anticipated payments in future periods. The payments are then discounted to [the date of withdrawal]."

The Town of Webb decided not to withdraw in 2003 but reversed course in 2004 and, along with the Town of Salisbury, gave notice of withdrawal effective December 31, 2004. Another reserve analysis was commissioned, and the estimated liabilities dramatically increased to about $17.2 million. Like the 2003 analysis, the 2004 report referred to the assessed amount as "undiscounted" and provided examples of discounted totals, based on interest rates ranging from one to five percent.

Due to concern over rising costs, in June 2005 the County passed a resolution to terminate the Plan pursuant to Workers' Compensation Law § 73, effective December 31, 2005 (Local Law No. 2 [2005] of County of Herkimer). The Plan would take on no new claims after that date, but would remain in existence to fund the approximately 125 outstanding workers' compensation claims, known as "tail claims." In order to ensure funding for the tail claims, the County created an abandonment plan (Abandonment Plan) that gave member municipalities two

choices. They could either remain as participants in the Abandonment Plan and pay an annual assessment of their portion of the tail claim liabilities, or they could withdraw from the Plan and pay a lump sum withdrawal fee. The lump sum fee, due at the end of the calendar year, would reflect the withdrawing member's equitable share of the Plan's outstanding liabilities according to the final annual estimate prior to abandonment. The final reserve analysis would assess the Plan's future losses as of December 31, 2005 (2005 Reserve Analysis).

In October 2005, seven of the participating municipalities, including the Village, instituted the instant action, challenging the Plan and the Abandonment Plan based on alleged mismanagement by the County. The County answered and, insofar as relevant here, raised counterclaims for breach of contract, seeking to recover the withdrawal liability based on the 2005 Reserve Analysis.

In June 2006, while the litigation was pending, the 2005 Reserve Analysis was released. The report estimated the Plan's outstanding liabilities as of December 31, 2005 to be $18.4 million on an undiscounted basis, an increase of $1.2 million from the previous year. The Village's share was calculated as approximately $1.6 million.

At this point, the Plan had run out of money and had resorted to borrowing funds from the County to keep up with payments on the tail claims. Given the dire situation, in October 2006 the County adopted a resolution allowing withdrawing municipalities to pay 75% of their withdrawal liability in full satisfaction of their obligations under the Abandonment Plan. Four of the seven plaintiffs in the lawsuit took the settlement offer, but the Village, along with two other municipalities, declined.

As relevant to this appeal, the County prevailed on summary judgment as to liability on its counterclaim for breach of contract against the Village. At the ensuing jury trial on damages, the parties presented extensive evidence on the actuarial methods underlying the reserve analyses. There was also testimony regarding various discount rates for the Plan liabilities contained in the reports. Witnesses for the County testified that the $18.4 million assessment in the 2005 Reserve Analysis represented an undiscounted liability and that examples of discount percentages ranged from one to five percent. A former executive director of the State Insurance Fund (SIF) testified that the State requires the SIF to apply a

discount rate of five percent. Over the Village's objection, the jury was provided with a verdict form that did not allow for any damages discount. The jury returned a verdict in favor of the County and awarded the full amount of damages sought by the County against the Village, $1,617,528. This figure represented the Village's undiscounted withdrawal liability as of December 31, 2005. Judgment was entered against the Village for $2,451,108.87, including $833,580.87 in prejudgment interest on the undiscounted verdict. The two other municipal plaintiffs did not perfect their appeals.

On the Village's appeal, the Appellate Division affirmed, concluding, in pertinent part, that discounting was inappropriate because "the County's award of damages did not actually constitute compensation for future losses; by its verdict, the jury found that plaintiff owed the County $1,617,528 as of December 31, 2005, a sum that it thereafter wrongfully withheld" (*Village of Ilion v County of Herkimer*, 103 AD3d 1168, 1169 [4th Dept 2013]). We granted leave to appeal (21 NY3d 857 [2013]), and now modify.

Generally, discounting future damages to their value at some point in the past is appropriate because it takes into account the time value of money. "[W]hen an amount intended to compensate for a future loss is discounted back to a particular time, the discounted amount represents the sum which, if invested at that time at reasonable rates of return, would theoretically produce the intended amount at the future time when the loss is incurred" (*Milbrandt v Green Refractories Co.*, 79 NY2d 26, 35 [1992]; *see also Jones & Laughlin Steel Corp. v Pfeifer*, 462 US 523, 536-537 [1983]). We are perhaps most familiar with discounting in wrongful death, personal injury, and medical malpractice actions, where discounting is required by statute (*see* CPLR 5031, 5041). In those contexts, it is often the future earning power of the injured party, or a similar measure of future damages, that must be reduced to its value on the date of injury. However, there is no material difference between the value of a decedent's future income in a wrongful death case and the value of workers' compensation benefits to be paid out over the life of a disability claim. In both cases, some or all of the losses will be incurred in the future. Here, the injury in question is a breach of contract, and the future losses manifest themselves in the form of contract damages.

It is undisputed that the Abandonment Plan constituted a contract between the County, as Plan administrator, and the

municipalities, as participants. The contract provided that if a participant chose to withdraw from the Abandonment Plan, it would have to pay a lump sum reflecting its equitable share of the Plan's outstanding liabilities, as of the date of withdrawal. To determine the amount due, the contract incorporated by reference "the final annual estimate and apportionment of costs prior to the abandonment of the Plan," i.e., the reserve analysis for the participant's last year of membership. In the Village's case, this was the 2005 Reserve Analysis since, by refusing to pay and initiating litigation, the Village effectively withdrew from the Plan on December 31, 2005 and became liable for the lump sum withdrawal fee.

The County contends, and the courts below agreed, that the $1.6 million assessed against the Village in the 2005 Reserve Analysis represents a liquidated sum due upon withdrawal from the Plan and thus should not be discounted. But the purpose of the withdrawal fee was to provide the County with sufficient funds to dole out future benefits to tail claim beneficiaries. According to the County, many of those benefits would be disbursed over 30, 40 or even 50 years. The actuarial estimate of each municipality's withdrawal liability therefore represented its aggregate *future* liability for existing claims. As the County concedes, those amounts were not discounted to present value.

Indeed, the 2005 actuarial report expressly stated that "[t]he Plan's total liability of $18.4 million [did] not reflect the fact that future benefits will be paid out over time and interest can be earned if the liabilities are prefunded." The report further provided examples of "discounted liabilities" to account for "[t]he timing of payments and the time value of money." For instance, the Reserve Analysis estimated that, at a 1% rate of return, the $18.4 million should be discounted to $16.7 million. At the other extreme, the report calculated that, on December 31, 2005, the Plan's outstanding liabilities would be worth $12.5 million if invested at a 5% interest rate. By its own terms, the report thus refutes the County's argument that the $1.6 million figure constituted a liquidated sum due upon withdrawal. Rather, the $1.6 million represents the Village's share of the Plan's estimated aggregate future losses. To require the Village to pay the undiscounted amount would give the County an impermissible windfall (*see generally Toledo v Iglesia Ni Christo*, 18 NY3d 363, 368 [2012]; *see also* Workers' Compensation Law § 65 [1]).

The County nonetheless argues that the realities of the situation make discounting inequitable. The County points to the

difficulties of making accurate projections in light of the many variables and unreliable assumptions inherent in actuarial analysis. The County also notes that the 2005 report qualified its examples of discounted liabilities, explaining that they were

> "provided for informational purposes only. In practice, in order for a discounted liability amount to be appropriate, the Plan would need to have sufficient assets available for investment to prefund the liabilities. Further, the actual interest rate achievable by the Plan would need to be recognized."

In other words, discounting assumes the payee will earn a return on an investment and is therefore inappropriate when no such investment is feasible. Therefore, the County asserts that the concept of discounting is inapplicable here due to the Plan's insolvency.

■ The County's arguments highlight the unique circumstances of this case. It is possible that the factors identified by the County could affect the appropriate discount rate. However, ultimately this is an action for breach of contract. The contract at issue, the Abandonment Plan, was drafted by the County and provided that the withdrawal liability would be determined by the 2005 Reserve Analysis. In turn, the Reserve Analysis calculated each member's share based on undiscounted, aggregate future losses. Any inherent uncertainty in that assessment does not alter the terms of the contract. Furthermore, to the extent the Abandonment Plan contains any ambiguity as to the amount of the Village's withdrawal liability, it should be construed against the drafter, Herkimer County. Had the County chosen to expressly define the withdrawal liability as an undiscounted, gross sum, rather than referring to the assessments in the Reserve Analysis, our result might be different. As it stands, the contractual liability, defined in the statutes, the Abandonment Plan, and the 2005 Reserve Analysis, encompasses future damages. Discounting is therefore appropriate.

The parties also dispute the date from which the preverdict interest should be calculated. The County agrees with the conclusion of the courts below that the interest should run from December 31, 2005, when the withdrawal payment became due. The Village, on the other hand, proposes two alternative dates: June 1, 2006, when the 2005 Reserve Analysis was released, or January 21, 2008, when the County asserted its counterclaims for breach of contract.

■ Preverdict interest "shall be computed from the earliest ascertainable date the cause of action existed" (CPLR 5001 [b]). Subject to certain exceptions, a claim for breach of contract exists on the date of the breach (*see* CPLR 213 [2]; *Ely-Cruikshank Co. v Bank of Montreal*, 81 NY2d 399, 402 [1993]). Here, the cause of action existed on December 31, 2005, when the Village owed the withdrawal fee. This date is readily ascertainable not only from the Abandonment Plan, but also from the enabling statute, which provides that, upon withdrawal from a self-insured workers' compensation plan, a "participant shall pay . . . an equitable share of the outstanding liabilities of the plan *as of the date of withdrawal*" (Workers' Compensation Law § 65 [1] [emphasis added]).

Although the Village's undiscounted liability was not calculated until June 2006, the liability existed as of the date of withdrawal. Moreover, in the intervening six months, the County was paying the Village's share of the workers' compensation benefits, and the Village was wrongfully withholding the funds owed. Accordingly, there is no reason to extend the accrual date simply because the 2005 Reserve Analysis was not released until June 2006.

The proposed January 2008 accrual date is similarly unavailing. In support of this date, the Village invokes the principle that interest on an accrued claim against a municipality is payable only from the time that payment is demanded, not from the point at which the debt matured (*see Rapid Tr. Subway Constr. Co. v City of New York*, 259 NY 472 [1932]; *Smith v Board of Educ. of City of N.Y.*, 208 NY 84 [1913]; *O'Keeffe v City of New York*, 176 NY 297 [1903]; *Taylor v Mayor*, 67 NY 87 [1876]). However, this rule has no application in this context.

Calculating interest on a municipality's debt from the time of demand was developed as a means to deter opportunistic creditors from buying up small claims against municipalities and waiting to demand payment until the statute of limitations has nearly expired in order to reap the benefits of the statutory interest rate (*see O'Keeffe*, 176 NY at 298-299). The case law emphasizes that a municipal defendant should not be "required to seek out those who have claims against it" (*Taylor*, 67 NY at 94; *accord Rapid Tr.*, 259 NY at 495; *O'Keeffe*, 176 NY at 298 ["It would be exceedingly difficult for the comptroller of a large city to look up claimants or their heirs or assigns and tender payment as their claims matured and became due"]).

The policy justifications for protecting municipalities from scheming claimants do not apply here. By waiting to assert its counterclaims, the County was not delaying a demand of payment from an unwitting municipality in order to "allow[ ] . . . interest from such maturity [to] afford a safe and profitable investment" (*O'Keeffe*, 176 NY at 298). On the contrary, the Village was well aware of the debt's maturity date, having anticipated the withdrawal liability in the October 2005 complaint. Under these circumstances, the courts below properly concluded that the claim accrued on December 31, 2005. The Village's damages should be discounted to that date, based on an appropriate discount rate to be determined upon remittal.

Finally, we note that this dispute between related governmental entities has already spawned nearly a decade of litigation. In the interest of minimizing additional costs to taxpayers and conserving judicial resources, the parties might well consider the wisdom of compromise going forward.

Accordingly, the order of the Appellate Division should be modified, without costs, by remitting to Supreme Court for further proceedings in accordance with this opinion, and, as so modified, affirmed.

ABDUS-SALAAM, J. (dissenting in part). The majority concludes that, because the withdrawal payment owed by plaintiff Village of Herkimer under the Abandonment Plan was calculated based on an estimate of plaintiff's share of workers' compensation claims to be paid in the future, the County's recovery of damages for the loss of the withdrawal payment constituted compensation for future losses, which should have been discounted to present value (*see* majority op at 818-820). In my view, however, the withdrawal payment was a lump sum contractual payment like any other, albeit one calculated via an actuarial estimate of the cost of outstanding workers' compensation claims, and the County suffered an immediate present loss when plaintiff failed to make the payment on the due date. Accordingly, I would hold that the trial court properly declined to discount the damages award to present value because it remedied only a present loss, and I dissent from the majority's conclusion to the contrary.

The law is not in dispute here. In a breach of contract action, the non-breaching party is generally entitled to compensatory damages to place it in the same position it would have occupied had the breaching party satisfied its obligations under the

contract (*see generally Kenford Co. v County of Erie*, 73 NY2d 312, 319 [1989]; 36 NY Jur 2d, Damages § 19). Where the contract requires the breaching party to continue to make payments or otherwise perform on the contract at various future times subsequent to the breach, the non-breaching party must be awarded damages that will compensate that party only for its losses as they occur on those future dates, and thus any damages awarded for those future losses must be discounted to present value to prevent the non-breaching party from obtaining the windfall of an award that will increase over time to exceed the amount necessary to cover those future losses at the time of their occurrence (*see Randall-Smith v 43rd St. Estates Corp.*, 17 NY2d 99, 103 [1966]; 36 NY Jur 2d, Damages § 38). Logically, however, where a contract requires a party to make a specific payment on a set date in the present and not to perform any future duty thereafter, that party's breach of that present contractual obligation causes a present loss to the non-breaching party, and therefore the non-breaching party is entitled to undiscounted damages that are needed to cover a loss which it immediately suffers in full.

Here, plaintiff's breach of the contract, i.e., the Abandonment Plan, caused a present loss of the withdrawal payment to the County, and therefore the jury's damages award compensated the County for that present loss and did not have to be discounted to present value. Specifically, plaintiff sought to withdraw from the Abandonment Plan, which required plaintiff to pay a withdrawal payment on the date of its planned withdrawal, December 31, 2005. Had plaintiff performed under the contract by giving the County the undiscounted $1.6 million withdrawal payment on December 31, 2005, plaintiff would have completely fulfilled its end of the bargain, and plaintiff would not have owed, and the County would not have gained or lost from plaintiff, anything at any future time. Indeed, several other municipalities withdrew from the Abandonment Plan in exactly this manner, paying undiscounted withdrawal payments on their scheduled withdrawal dates and causing no further gain or loss to the County thereafter. Of course, since the County would have gained a $1.6 million withdrawal payment from plaintiff on the December 2005 due date if plaintiff had performed its contractual duty, it follows that the County lost that same amount immediately on that date when plaintiff withdrew from the Abandonment Plan without making the payment in violation of the contract. Therefore, the jury rightly

awarded the undiscounted $1.6 million amount of the withdrawal payment to the County in order to place it in the same position it would have occupied had plaintiff timely made that payment.

The contractual method of calculating the withdrawal payment did not alter the nature of that payment or the date on which the County lost it. In that regard, the Abandonment Plan provided that a withdrawing municipality's withdrawal payment was equal to the municipality's proportionate share of the Plan's "outstanding liabilities at the date of withdrawal." The County interpreted that contractual phrase to mean the cost of covering workers' compensation claims outstanding under the Plan at the time of withdrawal, and the County calculated that amount by conducting a common actuarial estimate of that cost called a reserve analysis. The County further concluded that the "outstanding liabilities at the date of withdrawal" did not have to be discounted to present value under the terms of the contract and therefore demanded a proportionate share of the undiscounted liabilities as a withdrawal payment from each withdrawing municipality. Although reasonable minds might disagree with the County's interpretation of the contractual terms defining the withdrawal payment—indeed, plaintiff unsuccessfully disputed the point in its pleadings—that issue is not now before us, and consequently we must assume that the plain language of the Abandonment Plan required any withdrawing municipality to pay an undiscounted lump sum on the date of withdrawal. Thus, when plaintiff failed to pay the withdrawal payment and breached the contract, plaintiff inflicted the present loss of the undiscounted lump sum withdrawal payment on the County, and the jury's award compensating for that present loss need not have been discounted to present value.

Although the Abandonment Plan, as thus interpreted, allowed for the possibility that the County might receive more or less than it actually needed to cover outstanding workers' compensation claims that would come due in the future, the possible variance between the eventual cost of the workers' compensation claims and the agreed-upon withdrawal payment was simply a fair and bargained-for allocation of contractual risk. In particular, the parties bargained for the payment of a flat withdrawal fee that they believed would be sufficient to cover the outstanding workers' compensation claims. In doing so, plaintiff accepted the risk that it would overpay in the event

the County overestimated those future liabilities, just as the County undertook the equal risk that the withdrawal payment might not cover the future liabilities if they proved to be greater than originally estimated. The parties accepted the perils of this bargain, and plaintiff was not entitled to a discount on damages just because the County might never suffer the realization of the risk.

Plaintiff's and the majority's reliance (*see* majority op at 818, 819) on *Toledo v Iglesia Ni Christo* (18 NY3d 363 [2012]), *Milbrandt v Green Refractories Co.* (79 NY2d 26 [1992]), and similar tort cases is misplaced. For example, in *Toledo*, the decedent and his estate suffered the immediate loss of decedent's pain and suffering in the accident that caused his death, and the estate suffered future losses such as decedent's lost earnings and parental support (*see Toledo*, 18 NY3d at 365-366). Accordingly, the jury apportioned its award among present and future damages, and the jury then discounted the future damages award to present value (*see id.*). We appropriately upheld that discounting to present value and also found that, under statutes relevant only to the wrongful death context, pre-verdict interest was properly calculated from the date of the death (*see id.* at 367-369). Similarly, in *Milbrandt*, another wrongful death case, we concluded that "no preverdict interest should be added to an award for future damages when the award is only discounted back to the date of the verdict" (*Milbrandt*, 79 NY2d at 36-37). Thus, those cases stand for the general proposition that, where a tort claimant will suffer continuing future losses as the result of the injury inflicted by the tortfeasor, the claimant's future damages must be discounted to present value to avoid a windfall recovery. By contrast, here, the County's loss of the withdrawal payment occurred on the date of the breach and not on any future date, and therefore the damages for that present loss did not have to be discounted.

Finally, because the trial court and the jury properly refused to discount the award to present value, the court fairly applied interest to the full amount of the award, which, again, consisted entirely of damages from a present loss on which interest was already owed. Moreover, under CPLR 5001 (b), the court correctly assessed interest starting on December 31, 2005. As correctly stated by the majority (*see* majority op at 821), on that date, plaintiff refused to honor its contractual obligation to make the withdrawal payment and wrongfully withheld that

payment, and therefore "there is no reason to extend the accrual date simply because the 2005 Reserve Analysis was not released until June 2006" (*id.*).

Accordingly, I would affirm the order of the Appellate Division.

Judges GRAFFEO, READ, SMITH and PIGOTT concur with Chief Judge LIPPMAN; Judge ABDUS-SALAAM dissents in part in an opinion in which Judge RIVERA concurs.

Order modified, without costs, by remitting to Supreme Court, Oneida County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.