**WESTERN ELECTRIC CO., Inc., et al. v. CINEMA SUPPLIES, Inc., et al.\***

No. 10345.

Circuit Court of Appeals, Eighth Circuit.

Nov. 21, 1935.

Harold Olsen and A. C. Paul, both of Minneapolis, Minn. (Paul, Paul & Moore, of Minneapolis, Minn., on the brief), for appellants.

Benedict Deinard, of Minneapolis, Minn. (George B. Leonard, of Minneapolis, Minn., on the brief), for appellees.

Before GARDNER, WOODROUGH, and FARIS, Circuit Judges.

WOODROUGH, Circuit Judge.

This appeal is taken by Western Electric Company, Inc., Electrical Research Products, Inc., and American Telephone & Telegraph Company to reverse an order which denied them a temporary injunction in a patent infringement suit brought by them against Cinema Supplies, Inc., a corporation, Joseph A. Numero, and Theodore Karatz. They claim that upon the proof made and the conclusions properly reached by the trial judge as to the facts a temporary injunctive order should have been issued and that the denial was contrary to well-established principles in such cases.

It appears that the American Telephone & Telegraph Company owns the ten patents in suit; that the Western Electric Company is its manufacturing subsidiary and that the Products Company is a wholly owned distributing subsidiary of the latter, and the three corporations were properly joined as plaintiffs. Western Electric Company v. Pacent Corporation (C.C.A.) 42 F.(2d) 116.

Prior to the institution of the present suit and in December, 1933, the three companies had brought a suit against a corporation known as Ultraphone Sound System, Inc., in which suit they charged the Ultraphone Company with infringement of their patent No. 1,231,764, originally issued to Fritz Lowenstein; and the Ultraphone Company, on its part, had also brought an action against the three companies. Joseph A. Numero and Theodore Karatz, appellants herein, were the persons who ran the business of the Ultraphone Company and before the return day of the order to show cause why a temporary injunction should not issue against Ultraphone they negotiated and consummated a compromise settlement of the suits, evidencing the same by a written instrument signed by the Electrical Research Products Company, Inc., and the Ultraphone Company, of date, December 31, 1932, and referred to as Exhibit K. It was recited in the agreement that Ultraphone was engaged in the business of manufacturing and distributing to theatres equipment for the reproduction of sound

\*Rehearing denied Dec. 21, 1936; writ of certiorari denied 56 S. Ct. 595, 80 L. Ed. ——.

in syncronism with or in connection with the projection of motion pictures and "that 'Products' asserts that the manufacture and distribution by Ultraphone of such equipment constitutes an infringement of certain patent rights of Products"; that in addition to the suit already brought "Products has in preparation additional suits against Ultraphone and its customers for infringement of certain other of Products' patent rights hereinafter referred to"; and it was provided "with respect to the patents enumerated in Schedule 'A' attached hereto and which are alleged by Products to be infringed by the equipment now being manufactured and distributed by Ultraphone, Ultraphone agrees that except as provided in paragraph 4, it will not in the future manufacture, sell, lease or use any equipment coming within the scope of any of said patents and that it acknowledges the validity of said patents and each of them." The exception referred to in paragraph 4 was made because, as recited in the agreement, Ultraphone was given the right to resell any equipments sold prior to the date of the settlement agreement "which may hereafter become repossessed by Ultraphone for credit reasons" and "Ultraphone shall have the additional right to sell the forty-two equipments which Ultraphone represents it now has on hand and ready for sale." Ultraphone agreed to pay $3,000 by way of royalty with respect to sums which had theretofore been collected by Ultraphone from the sale of such equipments and to pay 6 per cent. on all sums to be received in the future on such sales and on the sales of the forty-two equipments authorized to be sold by terms of the agreement. Provision was also made for quarterly reports of any sales made from the forty-two equipments and receipts therefrom, to be made by the Ultraphone Company to "Products," accompanied by the agreed royalty payments.

The Ultraphone Company paid the $3,000 cash royalty agreed upon, and the lawsuits were dismissed pursuant to the settlement agreement.

Afterwards, on July 11, 1933, Mr. Karatz caused a new corporation to be organized called Cinema Supplies, Inc. It took over the assets of Ultraphone and Mr. Karatz and Mr. Numero continued to carry on the business under the new name with substantially the same employees in the same location. Later the place of business was moved across the alley on the same street—from 34–36 Glenwood avenue, Minneapolis, to 38–40 Glenwood avenue. After Cinema Supplies, Inc., was organized, Mr. Numero called upon the contract manager of Products and negotiated a modification of the settlement contract, Exhibit K, to the effect that Products would accept a cash lump sum in full payment of all moneys due and to become due under the settlement contract of December 31, 1932, and that on payment of the lump sum Ultraphone could dispose of the twenty-five equipments which it claimed to still have on hand and would be under no further obligation to render reports of its sales to Products. The final clause of the amendatory agreement was, "Except as herein otherwise specifically provided the said agreement (of December 31, 1932) shall remain in full force and effect."

After the amendment to the settlement agreement was entered into and the $1,319.72 called for therein had been paid to Products, Mr. Karatz and Mr. Numero made up and offered for sale and sold in the name of the new company, Cinema Supplies, Inc., sound amplifying machines for use in connection with the projection of motion pictures in theatres known as "Ultraphone" sound equipment or "Ultraphone-Jewel" sound equipment, designated as type 2A3. The new equipment was intended for the same use as the equipment which was the subject-matter of the earlier suit brought by the three companies against the Ultraphone Company and was made up by craftsmen using ordinary skill, and without invention on their part. The witness Madigan, an electrical engineer who was employed by and worked under the direction of Mr. Numero and Mr. Karatz during the time they used the name Ultraphone as well as during the latter period when it had been succeeded by the Cinema Corporation, testifies that the new equipment is the "electrical equivalent" of the earlier equipment, but the tubes used in the new equipment are of the type designated 2A3 by the Radio Corporation of America which sells them as restricted licensee under the patents involved in this suit, and the sound amplifier equipment was made up so as to operate with the RCA 2A3 tubes. We think his testimony fairly reflects the relation of the two types of

equipment to each other. A letter to the RCA is in evidence signed by Mr. Numero to the effect that it was "expressly understood that the tubes * * * are licensed only for use in * * * talking machines where no business features are involved." The bill in equity filed by the three companies in this suit charges the Cinema Company and its officers with infringing ten of the patents which were enumerated in the settlement agreement and therein acknowledged to be valid and admitted to be infringed.

On the hearing of the order in this case to show cause why temporary injunction should not · issue, the District Court considered the bill and answer and voluminous testimony, and although it did not strictly "find facts specifically and state separately its conclusions of law therein" in full compliance with the rule (Equity Rule 70½, 28 U.S.C.A. following section 723) the position taken by the court on matters which appear to us controlling sufficiently appears.

In the first place, the weight of all the testimony submitted at the hearing is clearly to the effect that the Cinema Supplies, Inc., is simply the successor or alter ego of Ultraphone Sound System, Inc., in so far as matters involved in this suit are concerned. Mr. Karatz and Mr. Numero ran the business of Ultraphone and continued to carry on the same business under the name of Cinema without any interruption on account of the new corporate organization.

Summarizing on this issue, the trial court stated:[1] "Plaintiffs urge that the Cinema Supplies is the alter ego of Ultraphone, and the showing made strongly indicates that plaintiffs' position is well founded and that Cinema is merely a convenient corporate set-up for the activities of Karatz and Numero, who realized that Ultraphone would be limited in any field of sound equipment manufacture, and assumed that by the cloak of Cinema they could continue business (from) which they had through Ultraphone agreed to desist."

Our study of the testimony has led us to the same conclusion so arrived at by the trial court. Although the trial judge, later on in his statement, remarked that he deferred "any final determination of this question," we do not construe that expression to modify the unequiv-ocal declaration as to what the showing before the court indicated. Only temporary injunction was in question before the court at the time, and "final determination" could not be reached and had to be deferred until there was a trial on the merits. Such a "final determination" could have no place in the preliminary proceedings.

The trial court further found that "the Court is not convinced that Cinema will respond to any damages that the plaintiffs may recover if they are successful in this litigation. The Court is not so sanguine concerning the financial stability of the defendants," which statements we also find to be in accord with the evidence.

The trial court also gave consideration to the patents set forth in the bill and alleged to be infringed by the 2A3 sound amplifier equipment being made and sold by the Cinema Company. The court said:

"A consideration of the original affidavits submitted by the defendants touching upon the question of infringement indicate that they are mainly to the validity of the plaintiffs' patents, rather than the charge of infringement. The additional affidavit submitted by the expert Allison meets more directly this charge of infringement, but the categorical denials of infringement to be found here and there in the affidavits of Jones and Skifter do not convey much weight, in view of the rather superficial manner in which this entire subject is covered, in these affidavits. In fact, the Court gained the impression that the defendants did not seriously deny infringement, and that the denials were largely colorable. It would, however, be presumptuous for the Court to assume that he had grasped all the intricate details of the patents, and manifestly one is not able on this showing to assert dogmatically that the affidavits of the defendants are frivolous and should be summarily waived aside. Suffice it to say that the entire hearing left the Court with a rather pronounced reaction that the defendants' denial of infringement was formal rather than real."

"The Court stated at the close of the oral argument that the principal question to be determined was the issue of estoppel. The Court still adheres to that view."

The appellees strenuously insist that the trial court was mistaken in failing

[1] No opinion for publication.

to appreciate that their resistance to the charge of patent infringement was serious and real. However that may be, we are in full accord with the trial court's ultimate conclusion on the matter. The evidence presents strong probability that in making up the sound amplifier equipment of the 2A3 type in accordance with the teaching of the plaintiffs' patents there was infringement of some of the claims of the patents sued upon, and that some of such claims were valid. We find that the plaintiffs' proof on this issue was sufficient on the hearing for temporary injunction, though we do not indicate any final determination as to the scope or validity of any of their patents.

Turning to the agreement of compromise and settlement and the rights which accrued to the three companies thereunder, the trial court said:

"A fair construction of Exhibit 'K' will warrant no other conclusion but that the parties intended that the covenant not to manufacture should continue after Ultraphone had sold the enumerated amplifiers which were on hand and in process of manufacture. It must be obvious that the parties intended to compromise and settle for all time the controversy that had arisen between Ultraphone and the plaintiffs regarding the sale of infringing amplifiers. Ultraphone, in consideration of the mutual dismissals of pending litigation, agreed to pay a stipulated sum to cover past royalties and agreed to pay a sum or percentage on the future sale of amplifiers. It is quite apparent that after disposing of such amplifiers, Ultraphone agreed to and intended to cease manufacturing any equipment coming within the scope of the enumerated patents, and therefore Defendants cannot now confuse the issue by contending the agreement not to manufacture in the future and acknowledgment of validity to be mere surplusage. Such covenants may well be implied in the sale of such licensed apparatus by Ultraphone. By entering into the contract, Ultraphone acknowledged the validity of the patents in so far as the sale of the forty-two licensed amplifiers was concerned. But clearly the parties had more than that in mind when they unequivocally covenanted that in the future—after the sale of the forty-two amplifiers—no infringing amplifiers would be manufactured and sold by Ultraphone. It would seem this construction is too plain for argument.

"The case of Pope Manufacturing Company v. Gormully, 144 U.S. 224, cannot be considered as determinative of the question presented. The unique contract under consideration by that court which came within the category of an 'unconscionable, oppressive and iniquitous contract' is not remotely comparable to the document now under consideration. In fact, it is extremely difficult for the Court to understand why there should be any objection on the part of a court of equity to enforce a covenant not to infringe. If parties desire to compromise their difficulties, and for a consideration agree not to do that which is the subject of pending or threatened litigation, why should not such contract be specifically enforced if otherwise cognizable by a court of equity? This is not a situation where there is a mere inconsistency between the defense of invalidity and a contrary position formally maintained by the defendant, nor should it be confused with a license contract which has been entered into with an admission of validity and agreement not to contest and after the license is at an end or terminated, the doctrine of estoppel is sought to be invoked. Estoppel in the instant case does not rise solely by the relationship of licensor and licensee. The so-called settlement contract, Exhibit 'K', included a license, it is true, but in addition made specific provision for the non-manufacture of infringing articles after the strict relationship of licensor and licensee had ceased. The acknowledgment of validity and a covenant not to manufacture was intended by the parties to be permanent evidence of the validity of these patents as between these parties so as to obviate any question in the future in the event Ultraphone or its successors should infringe. This construction is borne out because admittedly it was not necessary for the infringer to indulge in any admission of validity or covenant not to manufacture infringing equipment in the future in so far as the forty-two amplifiers were concerned. It would necessarily follow from the payment of royalties that as to such equipment, Ultraphone admitted the validity of the patents. It must be borne in mind that the license agreement was merely incidental to the settlement of litigation, and as a part of that settlement based upon a valuable consideration, the covenant in question was agreed upon. The doctrine that

a limited license will not support an unlimited estoppel does not apply.

"Generally it may be conceded that the public is interested in the determination of the validity of a patent monopoly. Circumstances might arise where grasping settlements of patent litigation contain noncontest claims that may be considered iniquitous. However, it occurs to the Court that the wide use of sound equipment in the moving-picture industry and the extensive research that has been made, and is being made in that field, would give rise to sufficient competition so that there would be ample opportunity for the trade to test out the validity of the patents in question. However that may be, the Court assumes that at the trial full opportunity will be afforded to the defendants so that the Court may give every consideration to the charge of monopoly and the question of public policy. Needless to say, if it should appear on the trial that Exhibit 'K' was obtained by unfair practices or oppressive measures, the Court would be very quick to safeguard the rights of the defendant. * * *

"The contention now advanced by the defendants that duress and unfair practices were committed in procuring the contract in question (Exhibit 'K') is, in the Court's opinion, without merit and unfounded."

We find from consideration of the record that the foregoing findings of the trial court were such findings as were required by the evidence. The trial court correctly summed up the settlement that had been made between the parties and the effect that ought to be given to it. The situation was that in putting out their sound amplifiers through their Ultraphone Corporation, Mr. Karatz and Mr. Numero found themselves infringing the patents of the three companies and involved in litigation on that account. They effected a settlement of the litigation by agreeing, among other things, to acknowledge the validity of the enumerated patents and to refrain from ever infringing them again. There was nothing unconscionable about their agreement. On the contrary, it was made to settle lawsuits in the spirit most favored by equity. Having been made, it was the duty of the court of equity to uphold it.

We think these findings and conclusions of the trial court, which were all required by the testimony before it, clearly established the right of the plaintiff companies to the injunctive order for which they had applied. It appears to us that all of the elements upon which their right to such injunctive order must depend were present, proven by the weight of the evidence, and found by the trial court.

That is to say: The parties who were to all intents and purposes in full privity with the original parties to Exhibit K and who had bought their peace and relief from litigation by express acknowledgment of the validity of the plaintiffs' patents and by agreement never to infringe them were proceeding in violation of their promises to renewed infringement. The right which their patents give to the plaintiffs is a monopoly right, and the duty of the equity court was to preserve such right by injunction. Derk Mfg. Co. v. Northampton Textile Co. (C.C.A.3) 40 F.(2d) 266; Clements Mfg. Co. v. Eureka Vacuum Cleaner Co. (C.C.A.) 70 F.(2d) 701; Milwaukee Printing Co. et al. v. Stover et al. (C.C.A.) 290 F. 387, 389; McMaster et al. v. Daugherty Mfg. Co. (C.C.A.3) 219 F. 219; City of Grand Rapids et al. v. Warren Bros. Co. (C.C.A.6) 196 F. 892; Adam v. Folger (C.C.A.7) 120 F. 260; Stearns-Roger Mfg. Co. v. Brown (C.C.A.8) 114 F. 939; Tropic-Aire, Inc., v. Jumper (D.C.) 28 F.(2d) 631; W. A. Sheaffer Pen Co. v. Worth Featherweight Pen Co. (D.C.) 41 F.(2d) 820; Hutto Engineering Co. v. Grinder Sales Co. (D.C.) 18 F.(2d) 985. The right was not preserved by permitting Mr. Karatz and Mr. Numero to continue infringement under the name of their new corporation, even upon conditions which had to be fixed more or less upon conjecture.

Although it is true, as reiterated in many cases, that the issuance or withholding of temporary injunction rests in the discretion of the trial court, the discretion meant is a sound judicial discretion exercised in conformity with equity rules and precedents. Northern Securities Co. v. Harriman (C.C.A.) 134 F. 331, 332, affirmed 197 U.S. 244, 25 S.Ct. 493, 49 L.Ed. 739; Winchester Repeating Arms Co. v. Olmsted (C.C.A.) 203 F. 493; Schey v. Turi (C.C.A.2) 294 F. 679. Where a case for temporary injunction is clearly made out, it is not open to the trial court to deny the remedy. Derk Mfg. Co. v. Northamp-

ton Textile Co., supra, and cases above cited. See, also, Nisonoff v. Irving Trust Co. (C.C.A.2) 68 F.(2d) 32, 33; Coty, Inc., v. Leo Blume, Inc. (C.C.A.2) 24 F.(2d) 924; Rojas-Adam Corporation of Delaware v. Young et al. (C.C.A.5) 13 F.(2d) 988; Fordson Coal Co. v. Maggard (C.C.A.6) 2 F.(2d) 708.

It appears from statements made by the trial court that it "endeavored to weigh the equities between the parties"; that "one gains the impression that the advertising value of a denial or granting of an injunction is almost as important as the relief itself"; that "while the court has been rather positive in some of its views as expressed herein, it is conscious of the fact that many issues submitted are difficult, if not dubious"; that "after a balancing of the equities and a consideration of all the circumstances (the court) determines that if the defendants will protect the plaintiffs by a sufficient bond, a court of equity should deny the injunction. Such a disposition is not unfair to the plaintiffs." That, "the court has determined that in lieu of granting the temporary injunction as prayed for by the plaintiffs, the disposition of plaintiffs' motion as hereinbefore indicated will be fair to both parties."

We conclude that neither these considerations nor others which were urged upon the court justified the refusal of injunctive order pending the trial of the case. The settlement agreement which the holders of the patent rights had made with the infringers and the proceedings had under it were intended to and did absolutely debar those parties and their privies from ever making or selling equipment within the scope of the ten patents, and so a status quo was created which it was the duty of the court to maintain until it should appear on a trial that the Cinema Company had some superior equity.

The appellees attempt to justify the refusal to grant temporary injunction in an elaborate and able brief contending: "A." There had been no prior adjudication of the validity of the plaintiffs' patents; "B." Infringement was doubtful; "C." There was no threatened irreparable injury; "D." Implied license was asserted in good faith; "E." Laches in applying for temporary relief; "F." It appeared probable that the injury to defendants from injunctional order would be greater than the benefits to plaintiffs.

We have given careful consideration to each of the contentions and the authorities cited in support thereof by appellees, but are satisfied that none has been sustained so as to avail against the clear proof made by the three companies in support of their right to be protected fully in their monopoly under their patents against the parties defendant by temporary injunction pending final determination of the suit. The order appealed from is reversed, with directions to grant temporary injunction.