In the Matter of **GIBRALTOR AMUSE-MENTS, LTD., Bankrupt-Appellant,**
and
**The Wurlitzer Company and Wurlitzer Acceptance Corporation, Petitioning Creditors, Appellees.**

No. 319, Docket 26812.

United States Court of Appeals
Second Circuit.

Argued March 22, 1961.

Decided May 24, 1961.

George Becker, New York City, for bankrupt-appellant.

Edward R. Neaher, New York City (Chadbourne, Parke, Whiteside & Wolff, New York City and Charles J. Prentiss, New York City, on the brief), for Wurlitzer Co. and Wurlitzer Acceptance Corp., appellees.

Before MOORE, FRIENDLY and SMITH, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge.

Gibraltor Amusements, Ltd., the alleged bankrupt, is the operator of numerous "Juke Box" routes on Long Island. The Wurlitzer Company, principal creditor of the alleged bankrupt for a sum exceeding $1,000,000, filed an involuntary petition in bankruptcy against Gibraltor in March of 1960. The petition alleged insolvency, numerous acts of bankruptcy and that the debtor had fewer than twelve creditors. Gibraltor's answer denied the claimed indebtedness, challenged Wurlitzer's standing on the ground that it had been the recipient of preferential payments and denied there

were fewer than a dozen creditors. Bankruptcy Act, § 59, subs. b, d, 11 U.S.C.A. § 95, subs. b, d. In support of its last cited contention, Gibraltor submitted a list of its creditors on the date of the petition. To counter this, Wurlitzer subsequently moved to amend its petition—which motion was granted. The bankruptcy court also granted leave to Wurlitzer Acceptance Corporation (WAC), William F. Wadsworth and Joseph Rae to file as intervening creditors.

After a hearing, Referee Castellano decided all of the issues against the bankrupt. He held that the alleged debts and acts of bankruptcy had been amply proven, that Wurlitzer's petition was not a sham or a fraud on the court and that Wurlitzer, although secured for the larger portion of its claims, was an unsecured creditor for a sum far in excess of $500. Without deciding that certain installment payments made to Wurlitzer were preferential, the referee ruled that a preferred creditor has a "provable" claim so as to satisfy the requirements of § 59 sub. b, even though the claim is not "allowable" unless the preference is surrendered. Winkleman v. Ogami, 9 Cir., 1941, 123 F.2d 78. Cf. In re Automatic Typewriter & Service Co., 2 Cir., 1921, 271 F. 1. Finally, Referee Castellano found that Rae, Wadsworth and WAC all qualified as petitioning creditors and duly adjudged Gibraltor a bankrupt. On a Petition for Review to the District Court for the Eastern District of New York, Judge Bartels upheld the referee's findings in all particulars save the Rae petition. As to that, the court held that Rae's claim was "contingent as to liability," [187 F.Supp. 937] thereby disqualifying him as a petitioner. Because three petitioning creditors still remained, however, the court confirmed the adjudication of bankruptcy.

On appeal to this court, appellant has renewed all of his contentions below. There is absolutely no merit in most of them. The referee's various factual findings as to Gibraltor's insolvency, Wurlitzer's partially unsecured status

and the existence of the Wadsworth debt are amply supported by the record; they surely are not "clearly erroneous" as they must be to warrant reversal. Margolis v. Nazareth Fair Grounds & Farmers Market, Inc., 2 Cir., 1957, 249 F.2d 221; Stim v. Simon, 2 Cir., 1960, 284 F.2d 58; In re Tabibian, 2 Cir., 289 F.2d 793. The only substantial question raised is the standing of WAC as a separate petitioning creditor.

Wurlitzer Acceptance Corporation is a wholly owned subsidiary of the Wurlitzer Company. It was incorporated in 1957 and its business has been the financing of sales of the parent's products. Although WAC appears to have dealt solely in the commercial paper of Wurlitzer, it has obtained its own bank financing—on the strength of its own credit. It has been a separate corporate taxpayer for the purposes of the Federal income tax. The evidence indicates that both parent and subsidiary have scrupulously honored the separate corporate form of the latter. WAC's claim is for almost $17,000 on two notes guaranteed by Gibraltor. The notes had been purchased from Wurlitzer long before the filing of the petition; there is absolutely no evidence of attempted subversion of the Bankruptcy Act.

For most purposes, the law deals with a corporation as an entity distinct from its shareholders. Traditionally courts will pierce the corporate veil "when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime." United States v. Milwaukee Refrigerator Transit Co., C.C.E.D.Wis.1905, 142 F. 247, 255; In re Belt-Modes, Inc., D.C.S.D.N.Y.1950, 88 F.Supp. 141; Rapid Transit Subway Construction Co. v. City of New York, 1932, 259 N.Y. 472, 182 N.E. 145. Although courts will sometimes disregard the separate entity where it has been used as a "front" or a "mere conduit"—the so-called alter ego doctrine—the present case with its complete absence of fraud and strict honoring of the corporate form as to assets and inter-

corporate transactions[1] is not a proper one for the invocation of that rule. See In re Belt-Modes, Inc., supra, 88 F.Supp. at page 144; Shamrock Oil & Gas Co. v. Ethridge, D.C.D.Colo.1958, 159 F.Supp. 693, 697; Western Electric Co. v. Cinema Supplies, 8 Cir., 1935, 80 F.2d 106, 108; 1 Fletcher Cyc. Corp., Perm.Ed. §§ 41, 43.[2]

Since ordinary principles of the law of corporations do not warrant the disregard of WAC's corporate identity here, it remains only to ascertain whether anything in the language or policy of the Bankruptcy Act demands such a result. Section 59, sub. b, 11 U.S.C.A. § 95, sub. b provides simply that "Three or more *creditors* who have provable claims liquidated as to amount and not contingent as to liability against any person * * * may file a petition to have him adjudged a bankrupt." "Creditor" is defined in § 1(11), 11 U.S.C.A. § 1(11) as follows: "'Creditor' shall include *anyone who owns a debt, demand, or claim* provable in bankruptcy * * *"

▉ The aforecited language, far from being restrictive in its definition of the scope of permissible petitioners, is virtually all encompassing. The emergence of the wholly owned corporate subsidiary as a common business instrumentality is not a brand new phenomenon. While Congress has repeatedly added to and amended the Federal taxing laws to deal with problems posed by the multiple corporation means of doing business, it has not seen fit similarly to tinker with the Bankruptcy Act. The detailed ground rules for "counting creditors" laid down by § 59, sub. e, 11 U.S.C.A. § 95, sub. e indicate that the principal Congressional fear of abuse was not that a debtor would be too easily petitioned into bankruptcy—rather that through connivance with friendly creditors the insolvent debtor might be able unfairly to hamstring one or two large creditors. The courts have long evinced a disposition to honor the separate corporate entity in bankruptcy matters; Comstock v. Group of Institutional Investors, 1948, 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 1911; In re Belt-Modes, Inc., supra. If Congress meant to alter ordinary judicial rules governing corporations, it should have so provided specifically.

Whether the policy of the Act calls for a more narrow construction of qualified "creditors" is a closer question. The present requirement of three petitioning creditors, inserted in the Act of 1898, is a compromise between the quite liberal provision of the Act of 1841 and the restrictive requirements of the 1867 Act. 3 Collier on Bankruptcy 548. In the process of "counting to three," the courts have perhaps been overly liberal in allowing the holders of assigned claims to qualify as practitioners. See In re Bevins, 2 Cir., 1908, 165 F. 434, where the court allowed the petitions of two assignees who had taken claims for the specific purpose of making up the required statutory number. General Order 5(2), 11 U.S.C.A. following section 53, while recognizing assignees as petitioners, sets up a check against abuse of the assignment device by requiring an affidavit setting forth the particulars of the transfer.[3]

---

1. Apparently Wurlitzer handled most of WAC's collections for it while it collected on its own notes. Such an arrangement was undoubtedly cheaper and more efficient and is not enough from which to infer an internal disregard of WAC's separate entity.

2. "One corporation may be disregarded where the two are identical or indistinguishable in fact. Unless it is a mere instrumentality or agency or adjunct in that sense, or as a sham or is used in fraud, by the dominant corporation, it will not be disregarded; and it will not be disregarded unjustly." 1 Fletcher Cyc. Corp. 155.

3. General Order 5(2) provides: "Petitioners in involuntary proceedings for adjudication, whose claims rest upon assignment or transfer from other persons, shall annex to one of the triplicate petitions all instruments of assignment or transfer, and an affidavit setting forth the true consideration paid for the assignment or transfer of such claims and stating that the petitioners are the bona

It may be conceded to be highly questionable whether Congress meant to sanction traffic in claims merely for the purpose of creating a sufficient number of petitioning creditors. While such was the case in Bevins, and was there approved, no such machinations have been presented in the instant case. Even though WAC took the notes in the due course of business, without reference to any future bankruptcy proceeding, it is urged that the mere fact of "control" by Wurlitzer disqualifies the subsidiary's claim. This argument merely raises, in a slightly different guise, the question of the disregard of the subsidiary's separate entity. There has been no showing, however, that Wurlitzer has abused the distinct corporate form nor that it has used it fraudulently to subvert the Bankruptcy Act. Lacking such a showing, WAC's claim should be honored. Such an approach to this question is not a purely conceptual one; it must be kept in mind that protection of the separate creditors of WAC, who cannot reach the assets of Wurlitzer, can only be accomplished by the recognition of the subsidiary as an independent legal entity.

Affirmed.

FRIENDLY, Circuit Judge (dissenting).

With some regret as regards this particular bankrupt, I respectfully dissent from the conclusion that Wurlitzer and its wholly owned subsidiary, Wurlitzer Acceptance Corporation (WAC), may be regarded as two separate creditors for the purpose of § 59, sub. b of the Bankruptcy Act, 11 U.S.C.A. § 95, sub. b.

Assuming as I do that WAC had sufficient independence of its parent to be regarded as a separate corporation under state law in contract or tort litigation, Bartle v. Home Owners Co-Op, Inc., 1955, 309 N.Y. 103, 127 N.E.2d 832, or under federal law for income tax purposes, it does not follow that it is a creditor separate from its parent under § 59, sub. b. It is too often forgotten that whether a subsidiary corporation is to be deemed a separate entity "cannot be asked, or answered, *in vacuo*," Latty, The Corporate Entity as a Solvent of Legal Problems, 34 Mich.L.Rev. 597, 603 (1936); the issue in each case must be resolved by reference to the policy of the applicable statutory or common law rule. See, e. g., Hart Steel Co. v. Railroad Supply Co., 1917, 244 U.S. 294, 37 S.Ct. 506, 61 L.Ed. 1148; Chicago, etc., Ry. Co. v. Minneapolis Civic & Commerce Ass'n, 1918, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229. Although my brothers recognize that the requirement of three petitioning creditors in the Bankruptcy Act of 1898 (save where the bankrupt had less than twelve creditors) was a compromise by Congress between the divergent provisions of earlier statutes, that bland statement scarcely conveys the flavor. "In law also the emphasis makes the song," Bethlehem Steel Co. v. New York State Labor Relations Board, 1947, 330 U.S. 767, 780, 67 S.Ct. 1026, 1033, 91 L.Ed. 1234.

The first three bankruptcy acts, all repealed after relatively short periods, permitted a single creditor to initiate involuntary proceedings if his claim met the prescribed minimum.[1] Widespread sentiment against the 1867 Act, which not only allowed a single creditor to institute involuntary proceedings but provided for numerous acts of bankruptcy and, in the absence of creditor consent, denied a discharge from debts to a bankrupt who could not pay fifty cents on the dollar, MacLachlan, Bankruptcy (1956), p. 11, caused Congress to amend it in 1874, 18 Stat. 178, 181. In addition to making discharges less difficult to obtain and narrowing the acts of bankruptcy, the amendment provided that an involuntary petition could be filed only by one fourth of the total number of creditors with aggregate claims amounting to one third

fide holders and legal and beneficial owners thereof and whether or not they were purchased for the purpose of instituting bankruptcy proceedings."

1. In the Act of 1800, 2 Stat. 19, the amount was $1,000; in the 1841 act, 5 Stat. 440, it was $500; in the 1867 act, 14 Stat. 517, 536, $250.

of the dollar amount of the total debts. Still the statute was too harsh for debtor sentiment, and it was repealed in 1878, see 3 Collier on Bankruptcy, p. 548.

The impulse for a new bankruptcy law came from the 200,000 business failures in the United States between the 1878 repeal of the 1867 Bankruptcy Act and 1898. Hardship had been particularly acute in the West, where a great land boom had raged from 1883 to 1889, followed by a sharp collapse. Southern and Western Populists began a crusade for at least a temporary voluntary bankruptcy law to relieve the large numbers of honest debtors from oppressive burdens and give them a fresh start in life. See Representative Sparkman of Florida, 31 Cong.Rec. 1850.

Although Eastern congressmen were willing to concede that voluntary bankruptcy was a good idea see Representative Parker (N.J.), 31 Cong.Rec. 1852, many of them were unwilling to enact a voluntary bill without accompanying involuntary features designed to insure an equitable distribution of a bankrupt's assets among his creditors, and, to that end, to abolish preferences. This the Populists opposed. They argued there was no need to infringe on state rights by creating a federal remedy for the collection of debts: state laws were adequate for the purpose. Bankruptcy was viewed as a stigma difficult to erase; it was one thing to allow a hopelessly burdened debtor to choose this disagreeable alternative as preferable to eternal debt but quite another to permit blood-thirsty creditors, with only their own interests at heart, to plunge an unwilling debtor into disgrace—the more so since in many cases the debtor reasonably might hope that the upturn in his fortunes was just around the corner, and bankruptcy would deprive him of the right to keep his business alive in the meantime. See 31 Cong. Rec. 1793 (Underwood, Ala.), 1838 (Settle, Ky.), 1863 (Linney, N. C.), 2313 (Sen. Stewart, Nev.). This position was summed up by Representative Lewis of Georgia, 31 Cong.Rec. 1908: "Voluntary bankruptcy is the means of the redemption of the unsuccessful and fallen debtor. Involuntary bankruptcy is a weapon in the hands of the creditor to press collections of debt harshly, to intimidate, and to destroy." [2] Thus the Populists denounced the bankruptcy bill as an "engine of oppression" (Sparkman, Fla., 31 Cong.Rec. 1851), "intended to bind hand and foot the debtors of this country and place them in the vise-like grip of the greedy cormorants of the country" (Henry, Tex., 31 Cong.Rec. 1803), and even tied the issue to the silver question, haranguing the "conspiracy of gold and monopoly" (Sen. Stewart, Nev., 31 Cong. Rec. 2359–60).[3] Easterners countered that a properly restricted involuntary bankruptcy law was a benefit not only to creditors but to debtors as well. In the absence of such a law creditors become nervous; whenever the debtor's assets seem less than his liabilities, they are likely to grab them precipitously, thereby forcing the debtor to the wall, lest other creditors beat them to the draw and they get nothing. 31 Cong.Rec. 1789 (Henderson, Iowa), 1852 (Parker, N. J.).

The provisions of the statute with respect to involuntary bankruptcy were the resulting vector of these opposing forces, an attempt to make involuntary bankruptcy less unpalatable to the Populists by surrounding such proceedings

---

2. Seventy years earlier, in 1827, Martin Van Buren, denouncing an attempt to provide for voluntary and involuntary bankruptcy in a single statute, had said "It is an erroneous idea * * * that this bill can be made to serve God and mammon by combining two things totally at variance." 3 Cong.Deb. 279.

3. Some idea of the intensity of the feeling is conveyed by the remarks of Senator Stewart of Nevada against "this diabolical bill," 31 Cong.Rec. 2312; "This bill comes from the class of men who are grinding the face of the poor * * * (2362). This is a bill which belongs to the Dark Ages. It belongs to the age of the Inquisition; it belongs to the age of witchcraft * * *. It is dictated by the same spirit that hung and killed and drew and quartered women for witchery" (2408).

with careful safeguards for the debtor. The original bill in the 55th Congress, S. 1035, provided for three petitioning creditors if the total were twelve, just as in the present law. But in other respects the bill was too harsh toward debtors to suit the Senate. Although the substituted bill passed by that body, which reduced the number of criminal offenses, the acts of bankruptcy, and the causes for denying a discharge, permitted an involuntary petition to be filed by "a creditor or creditors having debts against such a bankrupt to the amount of $500 or more," as in the acts prior to 1874, the House Judiciary Committee substituted a bill more like that originally introduced in the Senate. This bill was bitterly debated in the House for more than 100 pages in the Record. Its proponents attempted to sugar-coat the pill by repeated reference to a number of safeguards inserted to protect debtors from oppressive use of the weapon of involuntary bankruptcy: to be insolvent one must have assets insufficient to pay his debts, not merely insufficient liquid funds to meet debts as they fall due; oppressive costs of proceedings under the 1867 act had been drastically pruned; petitioning creditors were required to post bonds to cover not only the costs of the proceedings but any damages that might result from a wrongful filing; widows, minors and the insane were protected; the bankrupt could be taken into custody only if he showed signs of departing to avoid examination; he might not be required to travel over 100 miles to testify; criminal offenses and acts of bankruptcy were reduced; and three creditors must join if there were twelve or more in all. H.R.Rep. No. 65, 55th Cong., 2d Sess., 25–27 (1897). An attempt was made by Representative Livingston of Georgia to require "that no man can be placed in bankruptcy except on a petition signed by two-thirds of his creditors representing two-thirds of the indebtedness," 31 Cong.Rec. 1791. But Representative Henderson, chairman of the Judiciary Committee, which reported the substitute bill, responded that the present bill "goes far enough, if not too far, in restraining creditors from moving, having to give bonds with sureties." Ibid. The House passed this version; a conference committee toned it down in several respects to make it more favorable to the debtor; and both houses enacted the conference bill.

Thus, the entire process that resulted in the enactment of the Act of 1898 was a pitched battle between those who wanted to give the creditor an effective remedy to assure equal distribution of a bankrupt's assets and those who were determined to protect the debtor from the harassment of ill-considered or oppressive involuntary petitions, including those by a single creditor interest. The requirement of three creditors was one of many provisions reflecting a compromise between the two opposing positions. It is not doing justice to this history to suggest that if Congress had meant to prevent a wholly owned subsidiary from being counted as a petitioning creditor separate from its parent, it should have explicitly said so.[4] We must "remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." Cabell v. Markham, 2 Cir., 1945, 148 F.2d 737, 739, affirmed 1945, 326 U.S. 404, 66 S. Ct. 193, 190 L.Ed. 165. Here the purpose to require three separate creditor interests, separate in reality and not merely in legal form, is not difficult to discern. With the temper of the 55th Congress on this subject, it would have required a bold man to arise on the floor of the House of Representatives and ask that the bill be clarified to insure that a corporation with a financing subsidiary

---

4. It should also be remembered that at common law a corporation could not hold stock in other corporations unless the power was expressly conferred; the extensive development of the use of subsidiaries apparently began with the New Jersey Act of 1888, pp. 385, 445, conferring the power in general terms. See 1 Hornstein, Corporate Law and Practice, § 111.

could be counted as two creditors if each unit held a claim against the debtor; it is hard to suppose the House managers would have imperiled the bill by sanctioning any such proposal and quite impossible to believe it would have been enacted. Yet, where the words permit either interpretation, our duty is to determine "which choice is it the more likely that Congress would have made." Burnet v. Guggenheim, 1933, 288 U.S. 280, 285, 53 S.Ct. 369, 370, 77 L.Ed. 748.

Comstock v. Group of Institutional Investors, 1948, 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 1911, especially when read in the light of Taylor v. Standard Gas & Electric Co., 1939, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669, does not support any view that a court of bankruptcy will regard parent and subsidiary as different entities *semper et ubique*; rather it held that on the facts the particular policy there applicable did not require that they be regarded as the same, as in the Taylor case to some extent the same policy had. Here we deal with a different policy—that only three distinct creditors may precipitate an involuntary bankruptcy of a debtor having more than twelve.[5] I cannot believe it consistent with that policy to hold that a single creditor corporation may insure its ability to initiate an involuntary bankruptcy by the simple expedient of organizing two financing subsidiaries—perhaps with independent creditors—and seeing to it that claims against each debtor are parceled out in advance of bankruptcy.[6] See In re Supreme Tool & Mfg. Co., D.C.E.D.Wis. 1956, 147 F.Supp. 158. Whether a wholly owned subsidiary with independent creditors might be deemed separate from its parent in a case where, as a result of

its own financial difficulties, the subsidiary was in effect acting for its creditors rather than its stockholders, need not be now determined; no such case is presented here.

corporate form with a purpose fraudulently to subvert the Bankruptcy Act; bankruptcy of the debtor might have been the furthest thing from contemplation when the claims were placed and there may have been good business reasons for doing so.

5. If my brothers' reference to In re Bevins, 2 Cir., 1908, 165 F. 434 indicates a view that the decision in that case ought be reexamined, I wholeheartedly agree. However, it can stand without requiring an affirmance here.

6. It could be said in such a case also that there was no evidence of abuse of the